# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00611-CV

**GJP, Inc.; Richard D. Herting; Classic Jaguar, Inc. and
Dan Mooney, Appellants**

**v.**

**Avijit Ghosh, Appellee**

**FROM THE COUNTY COURT AT LAW NO. 2 OF TRAVIS COUNTY
NO. 268,925, HONORABLE J. DAVID PHILLIPS, JUDGE PRESIDING**

## O P I N I O N

This appeal concerns a dispute arising from the purchase of a used 1967 Jaguar sports car by appellee, Avijit Ghosh, from appellants GJP Inc. and Richard D. Herting. Complaining that he had been misled regarding the Jaguar's condition, Ghosh filed suit against appellants and two other defendants, alleging violations of the Texas Deceptive Trade Practices Act, among other claims. His claims were tried to a jury. Based on the jury's favorable findings on Ghosh's DTPA claims, the trial court rendered judgment against all defendants, jointly and severally, for $11,500 in actual damages and $112,500 in attorney's fees; $20,000 in additional damages against appellants, jointly and severally, based on findings of knowing conduct; plus another $3,000 in damages against GJP. Appellants bring twenty-seven points of error challenging, among other things, the trial court's personal jurisdiction over them, its refusal to apply South Dakota law, the jury charge, and the

sufficiency of the evidence to support the jury's findings regarding liability and actual damages. For the reasons explained herein, we will affirm the judgment.

**BACKGROUND**

According to the evidence presented at trial, GJP is a South Dakota-based company principally engaged, at relevant times, in the plastering business. At pertinent times, GJP was owned by Gerald Johnson, a South Dakota resident.[1] Johnson testified that the company, in addition to its primary business focus, also held title to approximately a dozen Jaguar automobiles. Johnson explained that acquiring and restoring Jaguars was a hobby of his and that he found it "convenient" to place the cars' title in his company. Richard Herting, a longtime friend of Johnson and fellow South Dakota resident, was an authorized agent of GJP who handled various business dealings of the company. He also shared Johnson's interest and work with his Jaguar collection. Appellants concede that, at all relevant times, Herting was acting within his authority as an agent of GJP.

Among the Jaguars in the collection was a red 1967 E-type Jaguar convertible. When purchased by GJP in 1999, this vehicle had been partially disassembled and was missing bumpers, door handles, most of the interior, and parts of the engine. Johnson and Herting reassembled it and, among other work, repainted it red, installed an interior and top, cleaned out and "redid" the gas tank, got "most of the wiring to work," and installed new wheels and tires. Johnson explained that he later chose to resell the 1967 E-type because he was restoring a 1968 E-type and "just didn't need two of them"; he added that he had lost interest in the 1967 vehicle once the "puzzle" of repairs had

---

[1] "GJP" apparently stands for *G*erald *J*ohnson *P*lastering.

2

been completed. GJP had not previously sold one of its Jaguars, and Johnson denied that he had purchased the car with the intent to resell it. At trial, Ghosh questioned this explanation, suggesting that appellants had chosen to sell the car because they were aware of problems with it.

Herting advertised the red Jaguar on three websites around the world where, he testified, such vehicles were sold or traded—eBay, based in California; Jag-Lovers, based in Bergen, Norway; and Classic Jaguar, an Austin-based company that specialized in restorations of E-type vehicles. Herting explained that he chose Classic Jaguar because it was well-known and well-respected among Jaguar enthusiasts worldwide; there was also evidence that Herting and GJP had previously purchased parts from Classic Jaguar for use in their restorations, including the red Jaguar. Classic Jaguar is owned by Dan Mooney. Herting emailed information regarding the car to Mooney, who crafted, and Herting approved, an advertisement that Mooney placed on a portion of the Classic Jaguar website dedicated to similar "for sale" postings. The ad displayed two photographs of the red E-type and stated, "Believed low mileage (30,000) matching number car," "Strong mechanicals," and "New floors, sills, paint, interior (less seats), windshield, wiring, brakes, suspension, tyres[2] and wheels." It listed an asking price of $38,000 and directed inquires to Herting's South Dakota telephone number, also providing Herting's email address.

In the meantime, Ghosh, a Houston resident, had been searching websites with an interest in purchasing a used E-type Jaguar. Ghosh explained that since his boyhood in Great Britain, he had harbored dreams of some day owning an E-type Jaguar and that these dreams had

---

[2] Mooney, other Classic Jaguar personnel, and Ghosh had lived in Great Britain before emigrating to the United States. Their spellings of various words in their written correspondence in evidence reflected their geographic origins.

3

been rekindled by his spotting an E-type at a Houston car wash. Ghosh began searching websites. There was evidence that before purchasing the car at issue in this case, Ghosh negotiated the purchase of a Jaguar on the East Coast and even had it inspected before the deal fell through. Ghosh found the Classic Jaguar website, and inquired with Classic and Mooney about a blue Jaguar featured in one of the site's "for sale" ads. During a discussion about the blue car and the difficulty of finding reasonably priced E-types in general, Ghosh claims that Mooney mentioned, "Well, actually, there's an excellent car on our website right now," and referred him to appellants' ad for the red Jaguar.

Ghosh testified that Mooney vouched for Herting's experience and capability as a Jaguar restorer and his work on the red Jaguar in particular, indicating that Herting had used parts purchased from Classic Jaguar. Relying on Mooney's remarks about Herting and the car, Ghosh called Herting at his South Dakota phone number. The parties gave differing accounts of ensuing events. Ghosh testified that he called Herting four to five times before the Jaguar came to Texas. Herting testified that he received several calls from Ghosh, among a "few dozen" he received inquiring about the car. Ghosh claimed that during their first call, Herting made various representations echoing the statements in the website ad, explained the work he had done to the car,[3] and stated that the car drove well and was in fine running order,[4] that it was "rust-free," and that he had been storing the car in a heated garage. Ghosh claimed that he was impressed by Herting's apparently extensive knowledge of Jaguars and the fact that he had maintained and worked on so

---

[3] This work included, according to Ghosh, improvements to the cooling system, suspension, brakes, electrical system, and interior.

[4] Herting, according to Ghosh, added that he regularly drove the Jaguar to car shows and displayed it there.

many other Jaguars in the GJP collection. Ghosh gained further confidence in Herting, he testified, because Herting made apparently forthcoming acknowledgments that the hood "didn't fit exactly right," the seats had not been replaced, and the right rear quarter of the car was not original. After their first phone conversation, Herting emailed Ghosh approximately twenty photographs of the red Jaguar. Ghosh added that, at some point, he inquired about having the Jaguar inspected in South Dakota, but Herting had dissuaded him by claiming that Ghosh would be unable to find an impartial opinion because all of the potential inspectors knew him. Herting, by contrast, explained that while any potential South Dakota inspectors would know him because he and Johnson had essentially the only Jaguar collection in the state, he had suggested that Ghosh have the car inspected in a neighboring state.

Ghosh called Herting and offered him a price of $35,000, $3,000 below the asking price. Herting testified that Ghosh offered that price in exchange for taking the car "as-is" and without inspection. Both Herting and Johnson testified that it was not unusual in the marketplace for buyers to purchase used Jaguars without inspection, and that they had previously done so. Ghosh denies that he offered to purchase the car "as-is." He admits that he elected not to have the car inspected, blaming Herting and Mooney for inducing him into such a high level of confidence in the red Jaguar that he believed none was warranted.

In response to Ghosh's offer, Herting indicated that he needed to consult with his partner and asked Ghosh to call him back later. When Ghosh called, Herting accepted the offer on behalf of GJP. The parties agreed that they would meet at Classic Jaguar in Austin to conclude the transaction. It is undisputed that this location was chosen because Herting had previously planned

a trip to Austin with an empty trailer to pick up a race car GJP had purchased from Classic Jaguar. Johnson and Herting added that these terms were part of the parties' deal: they claimed that Ghosh agreed to forego an inspection if Herting would deliver the car to Texas at no charge.

On the following morning, Ghosh sent the following email to Herting:

> Richard
> I wanted to say thanks to you and your partner on agreeing to the deal we discussed by phone last night. As my very first E-Type this will be a boyhood ambition realised.
>
> When convenient perhaps you could let me know the VIN so I can organise insurance etc. I am looking forward to meeting you at Dan's [Mooney's Jaguar] . . . I shall bring a certified cheque in favour of "G.J.P. Inc."

Similarly, Ghosh arranged with Mooney, in advance of his meeting with Herting, to have work done on the red Jaguar, including a hood realignment and installation of seat belts.[5] He also made plans to drive the car over the weekend (the agreed-upon meeting date was a Friday) before returning the car to Classic on the following Monday to have the work performed. But Ghosh, at trial, dismissed as "complete nonsense" the notion that he had agreed to purchase the Jaguar while it was still in South Dakota. Instead, he characterized the parties' "deal" as being limited only to the price Ghosh would pay *if* he decided to purchase the car upon seeing it in Austin. According to Ghosh, "the car was being brought down to Texas for me to look at and any deal that was going to be conducted was going to be conducted here."

---

[5] He also inquired with Mooney regarding other cars Classic Jaguar had for sale.

With what he testified was his understanding that he had a firm sale, Herting loaded the red Jaguar on the empty trailer and, accompanied by his wife, drove to Austin. On the appointed date, Ghosh arrived from Houston with a $35,000 cashier's check dated the preceding day. He testified that he had already planned to spend the weekend driving the car in the Hill Country with his girlfriend, who had accompanied him to Austin. Ghosh entered Classic Jaguar, where he met Herting and Mooney in person, and walked outside to where the red Jaguar was parked. Herting briefly pointed out various features of the work he had done to the car. Ghosh testified that he noticed a paint chip on the trunk and that the trunk did not appear flush with the rest of the car when closed. Herting assured him that the effect was likely attributable to new rubber seals that would eventually compress. Ghosh testified that he did not regard either of these problems as sufficiently serious to deter him from purchasing the car, and that the car looked to him as it had been represented. Ghosh and Herting then went inside the dealership.

According to Mooney's testimony, he allowed Herting and Ghosh to use an empty office in which to meet. Ghosh gave his cashier's check to Herting, and Herting handed over the car's South Dakota title, repair and parts receipts, and keys. When they emerged from the office after ten or fifteen minutes, Ghosh exclaimed, "Dan, I own my first E Type" and then asked Mooney to "look at a couple of things on the car" for him. Specifically, Ghosh asked whether the trunk lid needed to be adjusted and whether the floors were new. Although Mooney glanced at some of these exterior features, he testified that his 30-second look at the car was by no means an inspection, which, he explained, requires two to three hours to complete.

Apparently satisfied with his purchase, Ghosh prepared for his planned Hill Country excursion that evening. According to Mooney, he exclaimed to Ghosh, "You're out of your mind." Mooney gave Ghosh the contact information for Pinkie's towing company, a company experienced in loading Jaguars and trusted by Classic Jaguar. According to Mooney, as he gave Ghosh the card, he said, "You're going to need them." Ghosh, by contrast, claims that Mooney assured him he would be fine, but acknowledges that Mooney volunteered the Pinkie's card.

Approximately eight to ten miles into his Hill Country excursion, Ghosh encountered what he perceived to be several problems with the car, including an overheating engine and leaking fluids. He ultimately had the car towed back to Classic Jaguar. Ghosh requested Classic Jaguar to inspect the car. The eventual inspection revealed, among other problems, cracks and other structural weaknesses in the engine frames—which, Johnson admitted at trial, created a danger to the driver—a blown head gasket, missing bolts, oil and water leaks, and corrosion.

Ghosh eventually filed suit in the trial court against GJP, Herting, Mooney, and Classic Jaguar. Appellants entered special appearances to contest personal jurisdiction, which the trial court denied. Appellants did not pursue the interlocutory appeal permitted by section 51.014(a)(7) of the civil practice and remedies code,[6] but proceeded to trial along with the other defendants. The trial court submitted against all defendants liability theories under the DTPA ("laundry list" violations and unconscionability), whether such conduct was committed knowingly, fraud, and malice. The trial court also inquired as to the amount of actual damages (under a benefit-of-the-bargain measure) and exemplary damages. As to appellants, the jury found in Ghosh's favor

[6] *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(7) (West Supp. 2007).

on all liability issues.[7]  The jury awarded $11,500 in actual damages, plus $20,000 in additional damages against Herting and $40,000 against GJP.[8]  Based on the jury's findings, the trial court rendered judgment against all defendants, jointly and severally, for $11,500 in actual damages and $112,500 in attorney's fees; $20,000 in additional damages against appellants, jointly and severally, for knowing DTPA violations; plus another $3,000 in additional damages against GJP. After appellants' motions for j.n.o.v. and to disregard findings were overruled, they appealed.[9]

## DISCUSSION

Appellants bring twenty-seven points of error, which can be categorized as: (1) challenges to the trial court's denial of their special appearances[10]; (2) a choice-of-law complaint[11]; (3) complaints of charge error[12]; and (4) evidentiary-sufficiency challenges to the jury's

---

[7]  The jury also found that Mooney and Classic had violated the DTPA and committed fraud, but that neither had acted knowingly or with malice.  The jury also found that GJP, Mooney, and Classic had each made negligent misrepresentations, but that Ghosh had also acted negligently, and apportioned responsibility 10% to Mooney, 60% to GJP, 5% to Classic, and 25% to Ghosh.

[8]  Although finding that appellants had each committed fraud and acted with malice, the jury awarded zero exemplary damages against them.

[9]  All defendants filed a joint notice of appeal.  Only GJP and Herting filed a brief and prosecuted this appeal.  Accordingly, the appeals of Mooney and Classic Jaguar are dismissed for want of prosecution.  *See* Tex. R. App. P. 42.3.

[10]  Points 1-4.  Point 25, a complaint of charge error, is related to both appellants' jurisdictional complaints and its choice-of-law issue.

[11]  Point 26.  Point 25, a charge error complaint, is also related to this contention.

[12]  Points 23-25.

findings on liability, knowing conduct under the DTPA, and the amount of actual damages.[13] In a final point of error, appellants complain that the attorney's fee award is erroneous because the underlying judgment is.[14]

**Personal jurisdiction**

In their first through fourth points of error, appellants contend the trial court erred in overruling their special appearances, urging there is legally and factually insufficient evidence of any facts that would support the trial court's assertion of personal jurisdiction over them.

### *Appellate jurisdiction*

Ghosh does not question that we have jurisdiction to consider appellants' issues challenging the trial court's denial of their special appearances. We observe that a recent decision of one of sister courts has raised questions regarding appellate court jurisdiction over appeals from denials of special appearances where, as here, the appellant does not take an interlocutory appeal from the denial of its special appearances but opts instead to raise the issue in its appeal from the final judgment following trial. *See Matis v. Golden*, 228 S.W.3d 301, 305 (Tex. App.—Waco 2007, no pet.) (holding that an interlocutory appeal under section 51.014(a)(7) of the civil practice and remedies code is the exclusive means of challenging the denial of a special appearance and must be brought within the deadlines governing interlocutory appeals); *see id.* at 312 (Gray, C.J., concurring) (emphasizing that this "holding means the losing party cannot wait until the end of the proceeding

---

[13] Points 5-22.

[14] Point 27.

10

and then appeal the denial of the special appearance, but must instead comply with the requisites of timely filing a notice of appeal for the accelerated appeal.").

Subject-matter jurisdiction cannot be waived or conferred by agreement and can be raised by the court sua sponte for the first time on appeal. *See Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 379 (Tex. 2006); *M.O. Dental Lab v. Rape*, 139 S.W.3d 671, 673 (Tex. 2004). Because we respectfully disagree with our sister court that appellate jurisdiction to review special appearance rulings is limited solely to that which the legislature has conferred in section 51.014(a)(7), *see* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(7) (West Supp. 2007), we decline to adopt the reasoning in *Matis*.[15]  For the same reasons, the deadlines that govern interlocutory

_____

[15] Courts of appeals "have appellate jurisdiction co-extensive with the limits of their respective districts, which shall extend to all cases of which the District Courts or County Courts have original or appellate jurisdiction, under such restrictions and regulations as may be prescribed by law . . . [and] such other jurisdiction, original and appellate, as may be prescribed by law." Tex. Const. Ann. art. V, § 6(a); *see also* Tex. Gov't. Code Ann. § 22.220(a) (West 2004) (courts of appeal have "appellate jurisdiction of all civil cases within [our] district of which the district courts or county courts have jurisdiction when the amount in controversy or the judgment rendered exceeds $100, exclusive of interest and costs."). As a general rule, "only final judgments are appealable," and interlocutory orders are not. *Texas A&M Univ. Sys. v. Koseoglu*, 233 S.W.3d 835, 841 (Tex. 2007) (quoting *Bally Total Fitness Corp. v. Jackson*, 53 S.W.3d 352, 355 (Tex. 2001)). Thus, a party desiring to challenge an interlocutory order ordinarily must wait until if and when the order is merged into a final judgment and then raise the issue in its appeal from the final judgment. *Id.*; *see Lincoln Prop. Co. v. Kondos*, 110 S.W.3d 712, 715 (Tex. App.—Dallas 2003, no pet.) (observing that any interlocutory orders in a case are merged into the final judgment). Our general appellate jurisdiction under article V, section 6 of the Texas Constitution and government code section 22.220 necessarily encompass the subject matter of any interlocutory orders that are merged into the final judgments on appeal—unless the legislature has elsewhere provided otherwise. Tex. Const. Ann. art. V, § 6(a) (our jurisdiction is subject to "such restrictions and regulations as may be prescribed by law . . . [and] such other jurisdiction, original and appellate, as may be prescribed by law."). We discern no such intent in section 51.014(a)(7) of the civil practice and remedies code.

Section 51.014(a) is one of the narrow legislative exceptions to the general rule

11

appeals, *see* Tex. R. App. P. 26.1(b), 28.1, are simply irrelevant here. *Cf. Matis*, 228 S.W.3d at 305 (relying on cases involving untimely appeals of still-interlocutory orders). We conclude that we have jurisdiction to consider appellants' issues regarding the trial court's denial of their special appearances and turn to them now.

### General principles

A court must possess personal jurisdiction over a party in order to issue a binding judgment against it. *CSR, Ltd. v. Link*, 925 S.W.2d 591, 594 (Tex. 1996). Texas courts may assert personal jurisdiction over a nonresident if (1) the Texas long-arm statute authorizes the exercise of jurisdiction, and (2) the exercise of jurisdiction is consistent with constitutional due-process guarantees. *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007) (citing *Schlobohm v. Schapiro*, 784 S.W.2d 355, 356 (Tex. 1990)).

The Texas long-arm statute authorizes service of process on nonresidents "[i]n an action arising from the nonresident's business in the state." Tex. Civ. Prac. & Rem. Code Ann.

---

that trial court orders cannot be appealed while still interlocutory. *Koseoglu*, 233 S.W.3d at 841. It is a grant of appellate jurisdiction we would not otherwise possess to consider the types of interlocutory orders the statute identifies. *Id.* at 842. This jurisdictional grant is stated in permissive terms: "[a] person *may* appeal from an interlocutory order . . . ." Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a) (emphasis added). The legislature did not state that section 51.014(a)(7) is the exclusive or mandatory means for appealing the types of orders within its scope, nor did it say anything about limiting our general appellate jurisdiction to consider such orders after they are merged into final judgments. Based on this text and its jurisprudential context, we cannot conclude that by its limited grant of jurisdiction to us to consider certain types of otherwise-unappealable interlocutory orders, the legislature intended correspondingly to limit our subject-matter jurisdiction over appeals from final judgments. Of course, if an interlocutory appeal is taken, the appellate rulings may have law-of-the-case implications regarding the same issues in any subsequent appeals, but this is not a limitation on the appellate court's *jurisdiction* to consider such issues.

12

§ 17.043 (West 1997). "In addition to other acts that may constitute doing business," a nonresident "does business" in Texas if it (1) "contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state"; or (2) "commits a tort in whole or in part in this state." *Id.* § 17.042(1), (2). The Texas Supreme Court has stated that the long-arm statute's broad "doing-business" language allows the statute to "reach as far as the federal constitutional requirements of due process will allow." *Moki Mac*, 221 S.W.3d at 575 (quoting *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 221, 226 (Tex. 1991)); *see also Schlobohm*, 784 S.W.2d at 357; *U-Anchor Adver., Inc. v. Burt*, 553 S.W.2d 760, 762 (Tex. 1977). Consequently, in many cases, the analysis of whether a Texas court may assert personal jurisdiction over a nonresident collapses into the single inquiry of whether jurisdiction comports with federal due-process limitations. *Moki Mac*, 221 S.W.3d at 575. Appellants do not dispute that Ghosh's claims fall within the literal language of the long-arm statute, but instead contend that the trial court's assertion of personal jurisdiction over them violated due process.

Like other due process inquiries, jurisdictional due process is ultimately concerned with the reasonableness of a state's assertion of power over an individual, in light of a balancing between individual liberty interests (here, not being forced against one's will to litigate in a faraway or unduly burdensome forum) and state sovereign interests (its sovereign power to try cases brought in its courts). *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291-94 (1980). Due process requires "fair warning that a particular activity may subject them to the jurisdiction of a foreign sovereign," thereby assuring "a degree of predictability to the legal system that allows

13

potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (quotations omitted). This requirement is frequently stated in terms of the "foreseeability that the defendant's conduct and connections to the forum State are such that he should reasonably anticipate being haled into court there." *Woodson*, 444 U.S. at 297; *see American Type Culture Collection v. Coleman*, 83 S.W.3d 801, 806 (Tex. 2002) ("The defendant's activities, whether they consist of direct acts within Texas or conduct outside Texas, must justify a conclusion that the defendant could reasonably anticipate being called into a Texas court.").

This overarching reasonableness inquiry has been refined into a two-part test: the assertion of jurisdiction over an out-of-state defendant who does not consent comports with due process when the defendant has established "minimum contacts" with Texas and the exercise of jurisdiction is consistent with "traditional notions of fair play and substantial justice." *Moki Mac*, 221 S.W.3d at 575 (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). We are to consider first whether the defendant has established "minimum contacts" with Texas; if that threshold is met, we then consider whether the assertion of jurisdiction comports with fair play and substantial justice. *See BMC Software Belgium, N.V. v. Marchland*, 83 S.W.3d 789, 795 (Tex. 2002).

"Minimum-contacts analysis," the Texas Supreme Court has explained, "focuses solely on the actions and reasonable expectations of the defendant." *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 790 (Tex. 2005). Minimum contacts exist when the nonresident defendant "purposefully avails itself of the privilege of conducting activities within the forum State,

thus invoking the benefits and protections of its laws." *Moki Mac*, 221 S.W.3d at 575 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)); *see Michiana*, 168 S.W.3d at 784 ("For half a century, the touchstone of jurisdictional due process has been 'purposeful availment.'").

When considering whether a defendant has "purposefully availed" itself of "the privilege of conducting activities" in Texas so as to "invoke the benefits and protections of its laws," only the *defendant's* contacts with the forum are relevant, not the unilateral activity of another party or third person. *Moki Mac*, 221 S.W.3d at 575; *Michiana*, 168 S.W.3d at 785. Thus, in this case, we look only to the actions of appellants to determine if they have purposefully availed themselves of Texas, not the actions of Ghosh or third parties like Dan Mooney (absent some basis for imputing Mooney's actions to appellants, and Ghosh has asserted none).

Similarly, the defendant's contacts with the forum "must be *purposeful* rather than fortuitous." *Id.* at 785 (emphasis added). Thus, "[s]ellers who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to the latter in suits based on their activities," *id.* (quoting *Burger King*, 471 U.S. at 475), while "a defendant will not be haled into a jurisdiction solely based on contacts that are 'random, isolated, or fortuitous.'" *Id.* (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984)).

Additionally, the defendant "must seek some benefit, advantage, or profit by '*availing*' itself of the jurisdiction." *Id.* at 785 (emphasis added). Personal jurisdiction, the Texas Supreme Court has stated, "is premised on notions of implied consent"—"that by invoking the benefits and protections of a forum's laws, a nonresident consents to suit there." *Id.* (citing *Woodson*, 444 U.S. at 297). "By contrast, a nonresident may purposefully avoid a particular

15

jurisdiction by structuring its transactions so as neither to profit from the forum's laws nor be subject to its jurisdiction." *Id.* (citing *Burger King*, 471 U.S. at 473). The bare fact that a defendant receives some benefit, advantage, or profit from Texas does not necessarily mean that it has purposefully availed itself of the state. *Id.* at 788 ("financial benefits accruing to the defendant from a collateral relation to the forum state will not support jurisdiction if they do not stem from a constitutionally cognizable contact with the state.").

"It is the quality and nature of the defendant's contacts, rather than their number, that is important to the minimum contacts analysis." *American Type Culture Collection*, 83 S.W.3d at 806. The United States Supreme Court has further emphasized that minimum-contacts analysis does not turn on "mechanical tests." *Burger King*, 471 U.S. at 478 (quoting *International Shoe Corp.*, 326 U.S. at 319). In the commercial arena, the court has similarly rejected "conceptualistic . . . theories of the place of contracting or of performance." *Id.* at 478-79 (quoting *Hoopeston Canning Co. v. Cullen*, 318 U.S. 313, 316 (1943)). Instead, we are to apply a "'highly realistic' approach that recognizes that a 'contract' is 'ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction.'" *Id.* at 479 (quoting *Hoopeston Canning Co.*, 318 U.S. at 316). "It is these factors—prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing—that must be evaluated in determining whether the defendant purposefully established minimum contacts with the forum." *Id.*

A nonresident's forum-state contacts may give rise to two bases of personal jurisdiction, "general" and "specific." General jurisdiction is established if the nonresident has made

16

"continuous and systematic" contacts with the forum, and does not depend on whether the defendant's alleged liability arises from those contacts. *Moki Mac*, 221 S.W.3d at 575. Specific jurisdiction is established if the defendant's alleged liability "aris[es] out of or [is] related to" an activity conducted within the forum." *Id*. at 576 (quoting *Helicopteros Nacionales de Columbia v. Hall*, 466 U.S. 408, 414 (1984)). When specific jurisdiction is alleged, the minimum-contacts analysis is focused on the "relationship among the defendant, the forum[,] and the litigation." *Id.* at 575-76 (quoting *Guardian Royal*, 815 S.W.2d at 228 (quoting *Helicopteros*, 466 U.S. at 414)). The Texas Supreme Court recently clarified the proper standard for determining this "relatedness" aspect of specific jurisdiction-minimum contacts: "for a nonresident defendant's forum contacts to support an exercise of specific jurisdiction, there must be a substantial connection between those contacts and the operative facts of the litigation." *Id.* at 585.

### *Standard and scope of review*

As plaintiff, Ghosh bore the initial burden of pleading sufficient facts to invoke personal jurisdiction over appellants under the Texas long-arm statute. *Moki Mac*, 221 S.W.3d at 574 (citing *American Type Culture Collection*, 83 S.W.3d at 807). Appellants then had the burden of negating all forms of personal jurisdiction that Ghosh alleged. *Id.* (citing *BMC Software*, 83 S.W.3d at 793). A trial court's determination of whether Texas can assert personal jurisdiction over a nonresident defendant is one of law that we review de novo. *Id.* However, the trial court frequently must decide disputed issues of fact before deciding the jurisdictional issue. *BMC Software Belgium, N.V.*, 83 S.W.3d at 794. Where, as here, the trial court does not enter express findings of fact and conclusions of law regarding its ruling on a special appearance, the reviewing

17

court infers all fact findings necessary to support the judgment that are supported by the evidence. *Id.* at 794-95.[16] These implied findings may be challenged for legal and factual sufficiency. *Id.* Once it is determined that the trial court's findings are supported by sufficient evidence or, if the material facts are undisputed, the reviewing court decides as a matter of law whether those facts negate all bases for personal jurisdiction. *Id.*

Under our legal sufficiency standard of review, we view the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We must credit favorable evidence if a reasonable fact-finder could and disregard contrary evidence unless a reasonable fact-finder could

---

[16] Appellants' twenty-fourth issue, attacking the trial court's refusal to submit a jury issue regarding the place where the parties' sale contract was formed, is premised in part on their view that our standard of review changes where, as here, an appellant opts to challenge the denial of a special appearance in its appeal from a final judgment following a jury trial. Specifically, appellants contend that because our scope of review includes all of the evidence on personal jurisdiction adduced at trial, as explained below, "[l]ogically, this means that in a jury trial, the factual issues relevant to the special appearance are to be tried to the jury just as any other factual issue." As explained below, the place the sale agreement was formed is ultimately immaterial because, even if we assume it was formed in South Dakota, appellants have purposefully availed themselves to Texas. We also reject appellants' underlying premise that the procedural posture of this appeal impacts our standard of review regarding disputed fact issues going to personal jurisdiction. Appellants cite no authorities to support this view, which is inconsistent with the Texas Supreme Court's recent personal-jurisdiction jurisprudence. *See Michiana*, 168 S.W.3d at 790-91 (rejecting concept that personal jurisdiction could turn solely on whether or not a contact with the forum state is tortious, observing that such an approach "confuses the roles of judge and jury by equating the jurisdictional inquiry with the underlying merits."); *see also Moki Mac*, 221 S.W.3d at 583 (rejecting "substantive-relevance" approach to the relatedness requirement of specific jurisdiction because "in practice it would require a court to delve into the merits to determine whether a jurisdictional fact is actually a legal cause of the injury."). Instead, determinations of such facts are for the trial court and, in the absence of express findings of fact and conclusions of law, we are to imply that the trial court found such facts supported by the evidence as were necessary to support its special-appearance ruling. *BMC Software*, 83 S.W.3d at 794-95.

18

not. *Id.* at 827. There is legally insufficient evidence or "no evidence" of a vital fact when (a) there is a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence conclusively establishes the opposite of the vital fact. *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). More than a scintilla of evidence exists to support a finding if the evidence would allow reasonable and fair-minded people to differ in their conclusions. *Id.*

In reviewing the factual sufficiency of the evidence, we consider and weigh all of the evidence in the record, and we may overturn a judgment only if it is so against the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Dyson v. Olin Corp.*, 692 S.W.2d 456, 457 (Tex. 1985).

The scope of our review includes all evidence before the trial court on the issue of personal jurisdiction. *Hotel Partners v. Craig*, 993 S.W.2d 116, 121 (Tex. App.—Dallas 1994, pet. denied) ("In determining whether [defendants] carried their burden" of negating all bases of personal jurisdiction, "we review all the evidence that was before the trial court."); *Carbonit Houston, Inc. v. Exch. Bank*, 628 S.W.2d 826, 829 (Tex. App.—Houston [14th Dist.] 1982, writ ref'd n.r.e.) ("[I]t is the duty of this court to review all of the evidence before the trial court on the question of jurisdiction."). At the time of its hearing on appellants' special appearances, the sole evidence before the trial court were affidavits filed by the parties and attached exhibits. The parties

19

did not present additional evidence during the hearing.[17] After the trial court denied appellants relief, as noted, they could have, but did not, take an interlocutory appeal from that ruling. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(7). They instead proceeded to jury trial and raised their jurisdictional challenge in their appeal from the final judgment. In that procedural posture, appellants acknowledge that our scope of review includes not only the evidence before the trial court when it ruled on their special appearances, but also all evidence adduced at trial. *See Bellair, Inc. v. Aviall of Texas, Inc.*, 819 S.W.2d 895, 898 (Tex. App.—Dallas 1994, writ denied) (equating a special appearance to a venue challenge and explaining that in determining such a challenge, the court must consider the entire record, "including the evidence adduced at the trial on the merits.").

### Purposeful availment

It is undisputed that both Herting and GJP are South Dakota residents, that neither maintains a place of business in Texas or has employees, servants, or agents within the state, and that neither is required to maintain nor maintains a registered agent for service in Texas. The evidence is also not disputed that the only business Herting or GJP had previously transacted in Texas was purchasing parts by mail from Classic Jaguar and purchasing a race car on eBay that Classic had

---

[17] There is no indication from the record that the trial court heard additional evidence at the hearing, and its order denying appellants' challenge recites only that it heard "argument." *See Michiana*, 168 S.W.3d at 783-84 (requiring "a specific indication that exhibits or testimony was presented in open court *beyond* that filed with the clerk" before presuming that the hearing was evidentiary). Thus, we do not infer from the absence of a reporter's record from the hearing that the trial court heard evidence from which findings could be implied in support of the court's ruling. *See id.* at 781-82 ("If all the evidence is filed with the clerk and only arguments by counsel are presented in open court, the appeal should be decided on the clerk's record alone" rather than also presuming that evidence supporting the trial court's order was presented at the hearing).

advertised for sale on that site. Ghosh concedes that appellants' forum contacts do not give rise to general jurisdiction over appellants. The parties instead join issue as to whether specific jurisdiction arises from Herting's acts in connection with the sale of the red Jaguar to Ghosh.

Appellants equate the underlying facts to those of the Texas Supreme Court's seminal decision in *Michiana Easy Livin' Country, Inc. v. Holten*. 168 S.W.3d 777. In *Michiana*, the court addressed "whether suit can be brought in Texas based on a nonresident's alleged misrepresentations in a telephone call with a Texas resident." *Id.* at 784. Holten was a Texas resident. Michiana was a "factory outlet" that sold Coachman RVs at a location in Indiana. Michiana had neither employees nor property in Texas, and was not authorized to do business here. The court further observed that Michiana "does not advertise in Texas or on the Internet, and thus did not solicit business from Holten or anyone else in Texas." *Id.* Holten, desiring to purchase a Coachman RV at a lower price than that available from Coachman dealers in Texas, inquired with the Coachman factory and, through it, learned of the Michiana factory outlet and obtained its phone number. Holten called Michiana, and entered into an agreement to purchase a Coachman RV. He sent payment to Indiana and took delivery in Texas, paying for delivery himself. Dissatisfied with his RV, Holten subsequently sued Michiana in Texas, alleging misrepresentations by the company during the phone call. The Texas Supreme Court held that Michiana lacked minimum contacts with Texas because it had not purposefully availed itself of the privilege of conducting activities here.

Although acknowledging that "a nonresident that directs marketing efforts to Texas in the hope of soliciting sales is subject to suit here in disputes arising from that business," the Texas Supreme Court emphasized that "[b]oth the United States Supreme Court and this Court have found

21

no purposeful availment in cases involving isolated sales by consumers who proposed to use the product in a state where the defendant did no business." *Id.* at 785, 786. It analogized the case to *World-Wide Volkswagen*, in which the United States Supreme Court held that a New York car dealer who did not advertise or do business in Oklahoma could not be sued in that state just because one of its buyers was involved in a collision there. *Id.* at 787. The Texas Supreme Court reasoned:

> The facts here are not the same as those in *Woodson*, but do not differ in any material respect. Michiana knew Holten would take his RV to Texas, while it was merely foreseeable to the defendant in *Woodson* that its buyer would drive his Audi to Oklahoma. But in either case the choice was entirely that of the purchaser; the seller had no say in the matter. Under Holten's theory, Michiana could be sued in any state or country from which he chose to place his call and take delivery. But as the Supreme Court stated, "unilateral activity . . . cannot satisfy the requirement of contact with the forum State."

*Id.* (quoting *World-Wide Volkswagen*, 444 U.S. at 298). The court also relied upon its earlier decision in *CMMC v. Salinas*, 929 S.W.2d 435, 437-40 (Tex. 1996), in which it had held that due process prohibited specific jurisdiction in Texas for a personal injury suit arising from winepress equipment sold by a French company to a Texas winery. The French company had "made no effort to market its winepress equipment in Texas" (although the company's independent distributor had run ads for CMMC products in national publications circulated to Texas), "had made only one other sale in Texas," and did not initiate the sale to the Texas buyer. *Michiana*, 168 S.W.3d at 787; *see CMMC*, 929 S.W.2d at 436-37, 439.

In its subsequent *Moki Mac* decision, the Texas Supreme Court further illustrated these principles in distinguishing Michiana and CMMC from a Utah-based outdoor expedition company that had actively solicited Texas business by mailing solicitations to past and prospective

customers, placing ads in local media, engaging in "mass and targeted direct-marketing email campaigns," and utilizing continuing relationships with customers to recruit additional business. 221 S.W.3d at 577-79. It contrasted Michiana—a "seller [who] did not purposefully direct marketing efforts here to solicit sales" yet sold an RV to Holten in Texas "by the mere fortuity that Holten happened to reside here"—with Moki Mac, "[a] nonresident defendant that directs marketing efforts to Texas in the hope of soliciting sales," who would be "subject to suit here for alleged liability arising from or relating to that business." *Id*. at 576.

In light of these principles, the Texas Supreme Court emphasized in *Michiana*, the bare fact that a nonresident defendant makes a sale to a Texas buyer does not constitute purposeful availment to the privilege of conducting activities in Texas so as to invoke the benefits and protections of its laws. *Michiana*, 168 S.W.3d at 786-87; *see Moki Mac*, 221 S.W.3d at 577 ("the mere sale of a product to a Texas resident will not generally suffice to confer specific jurisdiction upon our courts. Instead, the facts alleged must indicate that the seller intended to serve the Texas market."); *see also Michiana*, 168 S.W.3d at 788 n.59 (emphasizing that its precedents "should not be read to extend stream-of-commerce jurisdiction to a single sale"). The court similarly observed that, "the United States Supreme Court has emphatically answered the question whether a single contract with a Texas resident can automatically establish jurisdiction—'the answer clearly is that it cannot.'" *Michiana*, 168 S.W.3d at 786 (quoting *Burger King*, 471 U.S. at 475 n.18, 478). Although the court acknowledged that "in some circumstances a single *contract* may meet the purposeful-availment standard," that is not the case "when it involves a single *contact* taking place outside the forum state." *Id.* The court contrasted the single product sale at issue with long-

term franchise agreements, *see Burger King*, 471 U.S. at 478-82, and life-insurance policies, *see McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957), which it deemed capable of constituting minimum contacts because they entail "many contacts over a long period of time." *Michiana*, 168 S.W.3d at 787.

The Texas Supreme Court further contrasted purposeful availment to "the benefits and protections of the laws" with the mere realization of "financial benefits accruing to the defendant from a collateral relation with the forum state [that] do not stem from a constitutionally cognizable contact." *Id.* at 787-88. It suggested that "it is hard to imagine what possible benefits and protections Michiana enjoyed from Texas law. Holten paid for the RV in advance and could not have planned on taking it to Indiana regularly for service. Everything Michiana wanted out of the contract it had in hand." *Id.* at 787. "Indeed," the court posited, "it is hard to imagine how Michiana would have conducted its activities any differently had Texas had no law at all." *Id.*

The supreme court also held that two other acts by Michiana did not constitute purposeful availment: (1) Michiana's arrangement with a shipper to deliver the RV to Holten for use in Texas, and (2) Michiana's alleged misrepresentations during the phone call. Regarding shipping, the court observed that "[d]elivery was at Holten's sole request and sole expense," and added, "If a seller of chattels is subject to suit wherever a customer requests delivery, then the chattel has become its agent for service of process – a conclusion that the United States Supreme Court has expressly rejected." *Id.* at 788 (citing *World-Wide Volkswagen*, 444 U.S. at 296). It relied on its holding in *CMMC* that due process prohibited a state court from taking "personal jurisdiction over a foreign manufacturer merely because it knew its allegedly defective product would be shipped to

24

that state." *Id.* (quoting *CMMC*, 929 S.W.2d at 436). Notably, the French manufacturer in *CMMC* had shipped its product to the Texas buyer F.O.B. Houston—i.e., CMMC tendered delivery of the product in Texas and title passed there[18]—but neither the *CMMC* nor *Michiana* courts seemed to regard this act as constituting purposeful availment to the benefits and protections of Texas law. *See id.*; *CMMC*, 929 S.W.2d at 437-40; *cf. American Type Culture Collection*, 83 S.W.3d at 808 (fact that goods were delivered F.O.B. to an out-of-state location as significant factor in finding no general jurisdiction) (citing *Bearry v. Beech Aircraft Corp.*, 818 F.2d 370, 375-76 (5th Cir. 1987)).

As for Michiana's alleged misrepresentations during the phone call from Holten, the Texas Supreme Court squarely rejected the notion that personal jurisdiction comported with due process when asserted on the sole basis that "a tortfeasor knows that the brunt of the injury will be felt by a particular resident in the forum state." *Michiana*, 168 S.W.3d at 788-89 (terming the theory "committing a tort 'in' Texas" and "directed-a-tort jurisdiction").[19] Instead, the court reasoned, the defendant's underlying acts—its "conduct and connection to the forum"—must constitute purposeful availment apart from whether or not those acts gave rise to tort liability. *Id.* And, the act of "a single unsolicited phone call a nonresident answered from a single private individual in the forum state," the court emphasized, did not constitute purposeful availment. *Id.* at 788-90 (distinguishing tort in phone calls from those arising from the publications of thousands of allegedly defamatory

---

[18]    *See* Tex. Bus. & Com. Code Ann. § 2.319(a)(2) (West 1994), §§ 2.401(b), 2.503 (West Supp. 2007).

[19]    The court acknowledged that such an allegation would fall within the literal language of the Texas long-arm statute. *Id.* at 788.

25

articles in the forum state and "conduct . . . aimed at getting extensive business in or from the forum state").[20]

---

[20] The court additionally offered several policy justifications for this holding. First, the court posited that "directed-a-tort jurisdiction" inappropriately shifted the focus of specific jurisdiction from the relationship "among the *defendant*, the forum and the litigation" to that "among the *plaintiff*, the forum and the litigation," and made personal jurisdiction dependent on whether the plaintiff asserted a tort or contract claim. *Id.* at 790-91. It added that the theory "confuses the roles of judge and jury by equating the jurisdictional inquiry with the underlying merits."

> If purposeful availment depends on whether a tort was directed toward Texas, then a nonresident may defeat jurisdiction by proving there was no tort. Personal jurisdiction is a question of law for the court, even if it requires resolving questions of fact. But what if a judge and jury could disagree? May a trial judge effectively grant summary judgment in a local jurisdiction by deciding contested liability facts in favor of the defendant? And if a jury absolves a defendant of tort liability, is the judgment void because the court never had jurisdiction of the defendant in the first place?

> Business contacts are generally matters of physical fact, while tort liability (especially in misrepresentation cases) turns on what the parties thought, said, or intended. Far better that judges should limit their jurisdictional decisions to the former rather than involving themselves in the latter.

*Id.* at 790-91. The court added that "changes in technology have made reliance on phone calls obsolete as proof of purposeful availment." *Id.* at 791. The court reasoned: "While the ubiquity of 'caller id' may allow nonresidents to know a caller's telephone number, that number no longer necessarily indicates anything about the caller's location. If jurisdiction can be based on phone conversations 'directed at' a forum, how does a defendant avail itself of any jurisdiction when it can never know where the other party has forwarded calls or traveled with a mobile phone?" *Id.* Finally, responding to the dissent, which had emphasized Holten's fraud allegations as a basis for personal jurisdiction, the court held, "Jurisdiction cannot turn on whether a defendant denies wrongdoing—as virtually all will. Nor can it turn on whether a plaintiff merely alleges wrongdoing—as virtually all will. If committing a tort establishes jurisdiction, our colleagues will have to decide who is correct—and then the Texas jurisdictional rule will be: guilty defendants can be sued here; innocent ones cannot." *Id.* Instead, the court explained, the proper focus was whether a defendant's contacts with Texas are purposeful availment under the analysis it had described, not whether the contacts were tortious. *Id.* The supreme court concluded by explicitly disapproving lower court decisions holding that "specific jurisdiction is necessarily established by allegations or evidence that a nonresident committed a tort in a telephone call" or that "specific jurisdiction turns on whether a

Appellants urge that *Michiana* compels us to hold they did not purposefully avail themselves to the privilege of doing business in Texas so as to invoke the benefits and protections of its laws. Ghosh, like Holten, sued appellants based on misrepresentations allegedly made from out of state during one or more telephone calls. Each of these phone calls, Herting testified without dispute, was initiated by Ghosh. The mere allegation or proof that Ghosh relied on these out-of-state representations in Texas cannot support jurisdiction, appellants contend, nor are these phone calls proof of purposeful availment. *See Michiana*, 168 S.W.3d at 788-92. Appellants add that there is no evidence they purposefully solicited Ghosh's business in a manner that could give rise to specific jurisdiction. To the contrary, they emphasize Ghosh's admissions that he had learned about Herting and the Jaguar from Mooney (a third party) and called Herting in reliance on Mooney's vouching for both the car and Herting's work. *See Michiana*, 168 S.W.3d at 785 (only defendant's acts count in determining whether it purposefully availed itself to the forum). Consequently, appellants maintain, the only Texas connection between the phone conversations and the parties' ultimate "deal" was that Ghosh happened to live in Texas. *See Moki Mac*, 221 S.W.3d at 576.

Unlike Michiana, appellants did advertise on the Internet. *Cf. Michiana*, 168 S.W.3d at 784 (noting that Michiana "does not advertise in Texas or on the Internet, and thus did not solicit business from Holten or anyone else in Texas."). Nonetheless, they point out that under the "Texas law on Internet activities" recognized in *Michiana*, a mere "passive" website advertisement—one that does not permit interactivity—does not constitute purposeful availment to the viewer's forum.[21]

defendant's contacts were tortious rather than the contacts themselves." *Id.* at 792.

[21] In *Michiana*, the Texas Supreme Court acknowledged that "certain activities over the Internet" may constitute the sort of "marketing efforts to Texas in the hope of soliciting sales"

27

Appellants emphasize that Herting's ad consisted only of photographs and statements, listed an asking price of $38,000, and directed inquires to Herting's South Dakota telephone number and email address, but did not enable a viewer to interact online with Herting. *See Mink v. AAAA Dev. LLC*, 190 F.3d 333, 336 (5th Cir. 1999). The fact that the owner of the website was Austin-based Classic Jaguar, appellants further assert, does not distinguish their passive website advertisement from one posted anywhere else in the world. Appellants stress that Herting posted similar ads on two other websites around the world that were calculated to reach Jaguar enthusiasts

---

that may render a nonresident subject to suit in Texas for claims arising from those activities. *Id.* at 785 (citing, as other examples, advertising in telephone directories in Texas cities, *see Siskind v. Villa Found. for Educ., Inc.*, 642 S.W.2d 434, 436 (Tex. 1982), and operating an office for sales information and support, *see Kawasaki Steel Corp. v. Middleton*, 699 S.W.2d 199, 201 (Tex. 1985) (per curiam). The supreme court cited *Reiff v. Roy*, 115 S.W.3d 700, 705-06 (Tex. App.—Dallas 2003, pet. denied), to illustrate "Texas law on internet activities." *Michiana*, 168 S.W.3d at 785. *Reiff*, in turn, applies the sliding-scale approach of *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997). *Reiff*, 115 S.W.3d at 705-06; *see Experimental Aircraft Ass'n, Inc. v. Doctor*, 76 S.W.3d 496, 507 (Tex. App.—Houston [14th Dist] 2002, no pet.) ("Texas courts have applied the *Zippo* "sliding scale" in the same or similar fashion in determining whether Internet activity permits personal jurisdiction."); *see also Mink v. AAAA Dev. LLC*, 190 F.3d 333, 336 (5th Cir. 1999) (adopting the *Zippo* framework in the Fifth Circuit); *see generally* Peter D. Marketos & Jennifer Butler Wells, *Personal Jurisdiction Through the Internet in Texas*, 41 The Advocate 57 (Winter 2007) (surveying Texas state and federal law on the subject). At one end of the sliding-scale is a "passive" website that merely advertises on the Internet. *Mink*, 190 F.3d at 336. Such advertisements, accessible to anyone in the world connected to the Internet, do not constitute purposeful availment to any particular state. *See id.* At the other end of the scale are sites through which the owners do business over the Internet by entering into contracts with forum state residents by knowingly and repeatedly transmitting computer files over the Internet. *Id.*; *see also Moki Mac*, 221 S.W.3d at 578 (citing Moki Mac's "soliciting Texas residents through mass and targeted direct-marketing email campaigns" among other evidence of its purposeful marketing activities to Texas). In between are those sites with some interactive elements that enable a visitor to exchange information with a host computer. *See Mink*, 190 F.3d at 336. This third, intermediate category requires an examination of the extent and commercial nature of the interactivity. *Id.* The relevant portion of the website is that from which the cause of action is alleged to arise. *See Lewis v. Fresne*, 252 F.3d 352, 358 (5th Cir. 2001) (noting that for specific jurisdiction, the only relevant portion of the website is the portion from which the cause of action is alleged to arise).

worldwide—Jag-Lovers, based in Bergen, Norway and eBay, located in California. The Classic Jaguar website was included among these, Herting testified without dispute, not because of its geographic location but because it, like the other two sites, was well-known and well-respected within the global community of Jaguar enthusiasts.[22] *Cf. Moki Mac*, 221 S.W.3d at 577-78 ("a nonresident defendant's advertising in local media 'in and of itself, is a sufficiently purposeful act that is done in Texas.'") (quoting *Siskind v. Villa Found. for Educ., Inc.*, 642 S.W.2d 434, 436 (Tex. 1982)); *with CMMC*, 929 S.W.2d at 440 (finding no purposeful availment where only marketing efforts to Texas consisted of ads run in national publications having Texas subscribers).

As for Herting's conduct in Texas, appellants dismiss it as akin to Michiana's shipping the RV to Holten in Texas. *See Michiana*, 168 S.W.3d at 788 ("If a seller of chattels is subject to suit wherever a customer requests delivery, then the chattel has become its agent for service of process—a conclusion the United States Supreme Court has expressly rejected.") (citing *World-Wide Volkswagen*, 444 U.S. at 296)); *see also CMMC*, 929 S.W.2d at 437-40 (finding no personal jurisdiction over manufacturer that knew a machine it sold a Texas buyer was being shipped here F.O.B. Houston). In appellants' view, they executed a sale contract with Ghosh before the Jaguar ever left South Dakota and were merely performing under that agreement while in Texas. *Michiana*, 168 S.W.3d at 787 (mere existence of a contract with a forum resident does not constitute purposeful availment). The fact that performance took place in Texas as opposed to South

---

[22] In fact, the portion of the Classic Jaguar website on which Herting's ad was posted, appellants observe, included similar "for sale" listings from North Carolina, California, Colorado, Georgia, Australia, Canada, and England; another page featured testimonials from Classic Jaguar customers in Minnesota and Scotland.

Dakota or somewhere else, appellants add, stems from the fortuities that (1) Herting had already made plans to travel to Classic Jaguar with a trailer to pick up the race car appellants had purchased; and (2) that location also happened to be convenient to Ghosh, who lived in Houston and desired to have Classic work on the car. Appellants add that Herting's trip to Texas did not seek or obtain benefits or protections from Texas law, but merely provided a courtesy to *Ghosh* that saved him the costs and inconvenience of having to make separate shipping and payment arrangements to gain possession of the car.

Although attributing somewhat greater jurisdictional significance to appellants' advertisement on the Classic Jaguar website and his telephone conversations with Herting, Ghosh acknowledges that personal jurisdiction ultimately hinges on the implications of Herting's acts while physically present in Texas.[23] He urges that Herting availed himself of the benefits and protections of Texas law by traveling to Texas and selling him the Jaguar here. As noted, Ghosh disputes appellants' view of the "deal" they struck by telephone as "complete nonsense," claiming that he had agreed only to a *price* of $35,000 *if* he decided to purchase the car after seeing it in Austin and that "any deal that was going to be conducted was going to be conducted here." In the alternative, Ghosh argues that if the parties had executed a sale contract by phone, appellants purposefully availed themselves to Texas by agreeing to deliver the car and accept payment here. *See Ball v. Bigham*, 990 S.W.2d 343, 348 (Tex. App.—Amarillo 1999, no pet.) (nonresident purposefully availed himself

---

[23] In fact, during oral argument before this Court, Ghosh conceded that Texas would not have personal jurisdiction over appellants if Ghosh had traveled to South Dakota to conclude the transaction instead of Herting coming to Texas.

of Texas when executing Kansas sale contract and accepting payment in consideration of his promise to deliver engine to Texas and assist in its installation).

Assuming without deciding that the "deal" the parties struck by telephone constituted a contract for sale, as appellants contend, we nonetheless conclude that Herting's acts in Texas constituted purposeful availment of the privilege of conducting activities in Texas so as to invoke the benefits and protections of Texas law. To understand why, we first consider the nature of the duties that Herting would have assumed under this sale contract. Both Texas and South Dakota have adopted the Uniform Commercial Code, and the applicable provisions of each state's version are materially identical. It is undisputed that Herting agreed to deliver the Jaguar to Ghosh in Austin. Upon tender of delivery in Austin, title would pass to Ghosh. *See* Tex. Bus. & Com. Code Ann. §§ 2.401(b), 2.503; S.D. Codified Laws §§ 57A-2-401(2), 57A-2-503 (2004). Tender of delivery was a condition to Ghosh's duty to accept the Jaguar and, unless otherwise agreed, to pay for it. *See* Tex. Bus. & Com. Code Ann. § 2.507(a) (West 1994); S.D. Codified Laws § 57A-2-507(1) (2004). Conversely, unless otherwise agreed, Ghosh's tender of payment was a condition to Herting's duty to tender and complete delivery. *See* Tex. Bus. & Com. Code Ann. § 2.511(a) (West 1994); S.D. Codified Laws § 57A-2-511(1) (2004). Here, it is undisputed that Herting had agreed to accept payment from Ghosh upon his delivery of the Jaguar in Austin.

The obligation to tender delivery required Herting to place at Ghosh's disposal a Jaguar conforming to their sale agreement. *See* Tex. Bus. & Com. Code Ann. §§ 2.201, 2.313 (West 1994), § 2.503(a); S.D. Codified Laws §§ 57A-2-201, 57A-2-313, 57A-2-503(1) (2004). Ghosh had the right to reject the Jaguar if it did not conform to the sale contract. *See*

31

Tex. Bus. & Com. Code Ann. §§ 2.508(a), 2.510(a), 2.601, 2.602 (West 1994); S.D. Codified Laws §§ 57A-2-508(1), 57A-2-510(1), 57A-2-601, 57A-2-602 (2004). The U.C.C. also entitled Ghosh to inspect the car before payment or acceptance. *See* Tex. Bus. & Com. Code Ann. § 2.513 (West 1994); S.D. Codified Laws § 57A-2-513 (2004). Ghosh accepted the Jaguar and paid Herting. *See* Tex. Bus. & Com. Code Ann. § 2.606 (West 1994); S.D. Codified Laws § 57A-2-606 (2004).

We consider whether Herting's agreement to undertake these acts in Texas and his subsequent performance constitutes purposeful availment under the principles identified in *Michiana* and *CMMC*. The mere fact that Herting executed a sale contract with Ghosh would not suffice. *See Michiana*, 168 S.W.3d at 786 (quoting *Burger King*, 471 U.S. at 475 n.18, 478). Nor would it appear, especially under *CMMC*, that Herting's tender of delivery in Texas and transfer of title here is alone sufficient to support personal jurisdiction. *See id.* at 788 ("If a seller of chattels is subject to suit wherever a customer requests delivery, then the chattel has become its agent for service of process . . . ."); *CMMC*, 929 S.W.2d at 437-40.

For the same reasons, the fact that Herting personally delivered the Jaguar would not necessarily distinguish these facts from those of *CMMC*, as the third-party shipper there was acting as the French company's agent when delivering the winepress equipment and transferring title in Texas. *See id.* More generally, territorial presence can be a key factor tending to enhance a potential defendant's affiliation with a state and demonstrating the purposefulness of the contact, *Burger King*, 471 U.S. at 476, but *Michiana* makes clear that the bare fact of physical presence in a state does not necessarily equal purposeful availment. The *Michiana* court cited with approval a court of appeals decision that Texas had no personal jurisdiction over a nonresident shipowner

32

whose agent had assaulted and denied wages to seamen while their ship was physically present in a Texas port. *See id.* at 788 n.62 (citing with approval *Antonio v. Marino*, 910 S.W.2d 624, 627-28 (Tex. App.—Houston [14th Dist.] 1995, no writ)). Although commission of a tort while physically present in the forum state is a well-established basis for personal jurisdiction,[24] the court of appeals had reasoned that the shipowner had not purposefully availed itself of Texas because the ship's location when the torts allegedly occurred had been determined by its chartering company. *See Antonio*, 910 S.W.2d at 627-28 (noting that ship "has no regular schedule of ports at which it calls, but follows the schedule of the [third-party] charterer"); *Michiana*, 168 S.W.3d at 788 n.62 (citing *Antonio* for proposition that "nonresident shipowner whose agent assaulted and denied wages to seamen in Texas port had not purposefully availed itself of Texas because ship's location was fortuitous."); *see also American Type Culture Collection*, 83 S.W.3d at 806 ("The defendant's activities, *whether they constitute direct acts within Texas* or conduct outside Texas, must justify a conclusion that the defendant could reasonably anticipate being called into a Texas court.") (emphasis added).

On the other hand, there are factual distinctions between the actions Herting agreed to perform here and those of the sellers in *Michiana* and *CMMC*. In neither of those cases did the seller pay for delivery: In *Michiana*, the supreme court emphasized that Holten paid for delivery himself, *see Michiana*, 168 S.W.3d at 788 ("[d]elivery in Texas was at Holten's sole request and sole expense."), whereas in *CMMC*, shipment was paid for by the French company's independent distributor through whom the Texas company had placed its order. *CMMC*, 929 S.W.2d at 436

---

[24] *See infra* at p.40.

(noting that distributor, KLR, had "instructed CMMC to arrange with A. Germaine, a freight forwarder paid by KLR, to transport the press from CMMC's factory in Chalonnes, France, to the ship on which it would travel to the United States"). Herting, by contrast, delivered the Jaguar to Texas at his sole expense. Additionally, the parties agreed that payment would be made upon delivery of the Jaguar in Austin. In *Michiana*, in regard to whether the company had availed itself to the benefits and protections of Texas law, the Texas Supreme Court emphasized that "Holten paid for the RV in advance, and . . . [e]verything Michiana wanted out of the contract it had in hand." *Michiana*, 168 S.W.3d at 787.[25]

In sum, assuming appellants' characterization of the "deal" struck by phone as a contract for sale of the Jaguar, the contract provided that the entire sale was to be performed in Texas. *See* Tex. Bus. & Com. Code Ann. § 2.106(a) (a "sale" consists in the passing of title from the seller to the buyer for a price); S.D. Codified Laws § 57A-2-106(1) (2004) (same). In this way, the transaction was directed to Texas to a degree that those in *Michiana* and *CMMC* were not.

We cannot agree with appellants that Herting's physical presence in Texas when closing the sale is "fortuitous" rather than "purposeful" in the sense the United States and Texas supreme courts have employed those concepts. Although his previously-planned trip to pick up the race car from Classic Jaguar may have fortuitously created a good *opportunity* to perform the sale in Texas, Herting nonetheless acted purposefully in opting to do so. In contrast to the shipowner in *Antonio*, who had no control over where the ship would port, *Antonio*, 910 S.W.2d at 627-28, or

---

[25] *CMMC* does not detail the parties' payment arrangements, though it notes that "KLR [the distributor] quoted the price to Hill Country Cellars in deutch marks, although it would accept payment in U.S. dollars at the current exchange rate." *CMMC*, 929 S.W.2d at 436.

34

Michiana, who had no say over where the RV would end up, *Michiana*, 168 S.W.3d at 787, there is legally and factually sufficient evidence to support the trial court's implied findings that Herting had discretion and control over whether he would close the sale in Texas. As the Texas Supreme Court observed in *Michiana*, the purposeful-availment concept is based on implied consent—a nonresident may structure its transactions so as either to invoke the benefits and protections of Texas laws, thus impliedly consenting to suit there, or to "purposefully avoid [Texas] by structuring its transactions so as neither to profit from the forum's laws nor be subject to its jurisdiction." *Michiana*, 168 S.W.3d at 785. Herting's actions are much closer to the former than the latter.

We also cannot agree with appellants' contention that Herting's actions, even if purposeful, did not constitute availment to the benefits and protections of Texas law. *See Moki Mac*, 221 S.W.3d at 576 (observing that "standing alone, delivery of the single RV to Texas to accommodate Holten was a . . . deficient basis for jurisdiction"). Herting realized a significant benefit from his actions in Texas: he closed the sale and left with a $35,000 check. He enjoyed the benefits and protections of Texas law in the process. *See Arterbury v. American Bank & Trust Co.*, 553 S.W.2d 943, 948-49 (Tex. Civ. App.—Texarkana 1977, no writ) (nonresident defendant "enjoyed the benefits and protections of the laws of Texas, including the right to resort to our courts" as its Texas agents repossessed cars here on its behalf); *see also Ball*, 990 S.W.2d at 348. These facts stand in contrast to *Michiana*, where "[e]verything Michiana wanted out of the contract it had in hand" before the RV ever left Indiana. *See Michiana*, 168 S.W.3d at 787. Nor did Herting evidence any intent to avoid the application of Texas law to his actions in our capitol city. *Cf. id.* at 792-93 (discussing forum-selection clauses as proof of intent not to avail oneself to a forum);

35

*Hydrokinetics, Inc. v. Alaska Mechanical, Inc.*, 700 F.2d 1026, 1029-30 (5th Cir. 1983) (citing an Alaska choice-of-law clause among other factors demonstrating that defendant did not avail itself to the benefits and protections of Texas law).[26]

We further observe that while minimum-contacts analysis may often turn on fine factual distinctions, this does not mean that we apply "mechanical tests." *Burger King*, 471 U.S. at 478 (quoting *International Shoe*, 326 U.S. at 319). Rather, "[i]t is the quality and nature of the defendant's contacts, rather than their number, that is important." *American Type Culture Collection*, 83 S.W.3d at 806. When considering the quality and nature of a defendant's contacts with Texas, we do not, in other words, lose sight of our ultimate due process inquiry: whether the assertion of jurisdiction is reasonable in light of the nature of the defendant's actions in the forum and the state's interests implicated by them. Here, appellants agreed to conduct the entire sale transaction involving the Jaguar in Texas, and it is not unreasonable or unexpected that they might be hailed into court here in regard to claims arising from that activity. *See Arterbury*, 553 S.W.2d at 948-49 (rejecting due-process challenge to assertion of specific jurisdiction over nonresident defendant based on its agent's acts when repossessing cars in Texas). Appellants' assertions to the contrary—particularly their theory that Herting was not purposefully availing himself because he was merely "performing" the sale contract—are ultimately the sort of "'conceptualistic . . . theories of

---

[26] These factors also distinguish this case from a recent decision of the South Dakota Supreme Court that appellants have cited post-submission. *See Marschke v. Wratislaw*, 743 N.W.2d 402 (S.D. 2007). Among other differences, Wratislaw, the seller, never entered South Dakota, and Marschke, the buyer, paid to have the vehicle transported to South Dakota by a third-party motor carrier.

the place of contracting or of performance'" that we are to avoid. *Burger King*, 471 U.S. at 478-79

(quoting *Hoopeston Canning Co.*, 318 U.S. at 316).

We hold that Herting purposefully availed himself of the benefits and protections of

Texas law when closing the sale of the red Jaguar in Texas. Yet, as *Moki Mac* demonstrates,

purposeful availment is only one component of specific-jurisdiction minimum contacts analysis.

"Specific-jurisdiction analysis has two co-equal components. For specific-jurisdiction purposes,

purposeful availment has no jurisdictional relevance unless the defendant's liability arises from or

relates to the forum contacts." *Moki Mac*, 221 S.W.3d at 579. Appellants argue that even if

Herting's activities in Texas constitute purposeful availment, Ghosh's claims do not arise from or

relate to that contact.

### *Relatedness*

To evaluate the "relatedness" prong of specific jurisdiction, we are to examine

whether there is a "substantial connection between those contacts and the operative facts of the

litigation." *Id.* at 585. Applying that standard, the Texas Supreme Court in *Moki Mac* looked to the

factual issues that it anticipated would be the primary focus at trial to determine whether the

plaintiffs' misrepresentation claims arose from or related to Moki Mac's purposeful solicitation of

Texas customers:

> [T]he operative facts of the Druggs' suit concern principally the guides' conduct of
> the hiking expedition and whether they exercised reasonable care in supervising
> Andy. The events on the trail and the guides' supervision of the hike will be the
> focus of the trial, will consume most if not all of the litigation's attention, and the
> overwhelming majority of the evidence will be directed to that question. Only after
> thoroughly considering the manner in which the hike was conducted will the jury be

37

able to assess the Druggs' misrepresentation claim. . . .Whatever connection there may be between Moki Mac's promotional materials sent to Texas and the operative facts that led to Andy's death, we do not believe it is sufficiently direct to meet due-process concerns.

*Id.* Here, we can evaluate the relatedness of Ghosh's claims to Herting's Texas contacts based on the record following a jury trial. *See Bellair*, 819 S.W.2d at 898 (the court must consider the entire record, "including the evidence adduced at the trial on the merits," when special appearance rulings are challenged in appeals from final judgments).

Appellants argue that the operative facts of Ghosh's claims against them relate primarily to statements they allegedly made outside of Texas, not Herting's acts in Texas. In fact, Ghosh testified at trial that he decided to purchase the Jaguar in reliance on statements by Mooney (a third party), Herting's website advertisement, and representations by Herting during one or more of their telephone conversations. Ghosh did not identify any of the representations made the basis of his claims as having been made while Herting was in Texas. On appeal, Ghosh does not contend otherwise, insisting only that his *reliance* on Herting's representations occurred in Texas.[27]

---

[27] Ghosh's affidavit in opposition to appellants' special appearances (filed by trial counsel who later withdrew) does contain the following statement: "In Travis County, Texas, on or about January 31, 2003, Defendant Herting told me that the vehicle that forms the basis of this suit was running fine, or words to that effect." At trial, as noted, Ghosh did not testify to any such representations by Herting in Austin, as opposed to over the phone from South Dakota. Ghosh also stated in his affidavit that, "The events that form the basis of this lawsuit happened in Travis County, Texas, specifically at CLASSIC JAGUAR (USA), INC., d/b/a Classic Jaguar at 9916 Hwy. 290 West, Austin, TX on or about January 31, 2003." Ghosh does not suggest that these statements in his affidavit filed by prior counsel, in light of the trial record, are legally or factually sufficient to support a finding that Herting, while in Texas, made any of the affirmative representations that are the basis of his claims.

38

Appellants contend that, for these reasons, the operative facts of Ghosh's claims against them thereby lack the required substantial relationship to Herting's acts in Texas. We disagree.

The trial court's judgment against appellants, as noted, was based on the jury's findings of DTPA "laundry list" violations, unconscionable acts, and knowing conduct. *See* Tex. Bus. & Com. Code Ann. §§ 17.46(b); 17.50(a)(1) (West Supp. 2007). In its broad-form "laundry list" submission, the trial court defined "false, misleading, or deceptive act or practice" to include not only affirmative misrepresentations, but also the failure to disclose information when there was a duty to do so.[28] Appellants overlook that Ghosh's DTPA cause of action was not based solely on affirmative misrepresentations, but on failure to disclose facts when there was a duty to do so. Although this duty might have arisen from misrepresentations Herting allegedly made

---

[28] The trial court included the following definitions in its charge:

- Representing that the car had or would have characteristics that it did not have; or

- Representing that the car was of a particular quality if it was of another; or

- *Failing to disclose information about the car that was known at the time of the transaction with the intention to induce Avijit Ghosh into a transaction he otherwise would not have entered into if the information had been disclosed*; or

- Representing that the car was of a particular standard, quality, or grade, if it is of another; or

- Representing that work or services had been performed on, or parts replaced in the car when the work or services were not performed or the parts replaced.

(Emphasis added). *See* Tex. Bus. & Com. Code Ann. § 17.46(b)(5), (7), (22), (24).

The trial court also submitted theories of fraud and negligent misrepresentation, both defined only as affirmative representations.

from South Dakota, Ghosh's theory also was that Herting violated the DTPA by failing to disclaim these representations, and instead remaining silent, so as to induce him to proceed with purchasing the Jaguar without inspecting it. *See Kessler v. Fanning*, 953 S.W.2d 515, 521-22 (Tex. App.—Fort Worth 1997, no pet.) (holding evidence sufficient to support jury's finding of DTPA violations because buyers presented some evidence that seller knew, but failed to disclose, defects in their house). As explained above, even assuming that Ghosh and Herting had entered into a sale contract by telephone, Ghosh nonetheless had the right to reject the Jaguar upon tender of delivery in Austin. *See* Tex. Bus. & Com. Code Ann. §§ 2.508(a), 2.510(a), 2.601, 2.601; S.D. Codified Laws §§ 57A-2-508(1), 57A-2-510(1), 57A-2-601, 57A-2-602. Ghosh's allegations that he relied to his detriment on Herting's silence thus encompasses conduct by Herting while he was physically present in Texas to close the sale. As we have held that the same conduct by Herting constituted purposeful availment, the required "substantial connection between those contacts and the operative facts of the litigation" is present. *Id.* at 585; *cf. Oryx Capital Int'l v. Sage Apts., L.L.C.*, 167 S.W.3d 432, 441-43 (Tex. App.—San Antonio 2005, no pet.) (out-of-state misrepresentations on which suit was based allegedly occurring *after* defendant's in-state contacts with Texas did not arise from or relate to those contacts).

We also observe that the commission of a tort while physically present in the forum state has long been recognized as a permissible basis for personal jurisdiction under the due process clause. *See Hess v. Pawloski*, 274 U.S. 352, 356-57 (1927) (rejecting due-process challenge to state implied-consent law authorizing personal jurisdiction over nonresidents for claims arising from their use of motor vehicles in the state); *Arterbury*, 553 S.W.2d at 948-49 (rejecting jurisdictional

40

challenge regarding tort claims arising from non-resident defendant's repossession of automobiles in Texas); *but see Michiana*, 168 S.W.3d at 788-92 (explaining that personal jurisdiction does not turn on whether an act is tortious, but on whether the act constitutes purposeful availment). In terms of the ultimate due-process inquiry, the defendant's commission of a tort while physically present in the state tends to implicate state interests while also demonstrating that litigation there would not typically constitute an unwarranted burden on the defendant. *Id.* at 799. These principles further support our conclusion that minimum contacts are present here with regard to appellants' omission tort while purposefully availing themselves of the Texas forum.

Additionally, Herting's alleged misrepresentations or failure to disclose was not the sole focus of the evidence at trial. That focus, as it related to appellants, was threefold: (1) what appellants knew about the condition of the Jaguar when selling it to Ghosh; (2) what Herting told Ghosh about the car; and (3) the actual condition of the car when Ghosh drove it off into the Hill Country. Both Ghosh and appellants devoted considerable attention at trial to the condition of the Jaguar when sold, focusing on the car's performance on Texas roads, the results of Texas inspections, and the impact of Ghosh's treatment of the car in Texas during the months before trial. This is the converse of the trial record the supreme court anticipated in *Moki Mac*: a trial primarily centered on disputed issues regarding out-of-state events, without whose resolution the claims of Texas misrepresentations could not meaningfully be evaluated. *Moki Mac*, 221 S.W.3d at 585. Here, the jury had to address the condition of a car brought into Texas through Herting's purposeful actions in order to evaluate Herting's liability for acts and omissions made in and out of state.

We conclude that there is legally and factually sufficient evidence that appellants have established minimum contacts with Texas.

### *Conclusion regarding personal jurisdiction*

We conclude that the trial court did not err in overruling appellants' special appearances. We overrule appellants' first through fourth issues.

## Choice of law

In their twenty-sixth point of error, appellants argue that the trial court erred in applying Texas rather than South Dakota law to Ghosh's claims. Appellants preserved this point by filing a motion asking the trial court to apply South Dakota law and requesting the trial court to take judicial notice of the South Dakota law that would govern Ghosh's claims, attaching copies of the South Dakota Deceptive Trade Practices and Consumer Protection Act and relevant case law. *See Coca-Cola Co. v. Harmar Bottling Co.*, 218 S.W.3d 671, 695 (Tex. 2006) (explaining that choice of law issue can be waived unless the complaining party objects to the law being applied, requests application of another state's law, and requests judicial notice of the law of the other state); *see also Kucel v. Walter E. Heller & Co.*, 813 F.2d 67, 74 (5th Cir. 1987) (holding that complaining party is required to "call the applicability of another state's law to the court's attention in time to be properly considered."). Appellants urged there were several important differences between South Dakota and Texas law governing Ghosh's claims: under South Dakota law, (1) only intentional or knowing misrepresentations are actionable; (2) only actual damages are recoverable; and (3) there is no provision for recovering attorney's fees. *See Compaq Computer Corp. v. Lapray*, 135 S.W.3d

42

657, 672 (Tex. 2004) (in choice-of-law analysis, "we must first decide whether Texas law conflicts with the laws of other interested states, as there can be no harm in applying Texas law if there is no conflict.").

Which state's law governs an issue is a question of law, which we review de novo. *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 848 (Tex. 2000); *Minnesota Mining & Mfg. Co. v. Nishika, Ltd.*, 955 S.W.2d 853, 856 (Tex. 1996). Texas uses the Restatement's "most significant relationship" test to decide choice-of-law issues. *Hughes Wood Prods., Inc. v. Wagner*, 18 S.W.3d 202, 205 (Tex. 2000); Restatement (Second) of Conflict of Laws § 6 (1971). Section 6 of the Restatement lists the general considerations we consider in this inquiry:

> (a)  the needs of the interstate and international systems,
> (b)  the relevant policies of the forum,
> (c)  the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
> (d)  the protection of justified expectations,
> (e)  the basic policies underlying the particular field of law,
> (f)  certainty, predictability and uniformity of result, and
> (g)  ease in the determination and application of the law to be applied.

Restatement (Second) of Conflicts of Laws § 6(2). We consider "the qualitative nature of the particular contacts" with a state, and the "state policies underlying the particular substantive issues." *Duncan v. Cessna Aircraft, Co.*, 665 S.W.2d 414, 421 (Tex. 1984). Also, in respect to claims of fraud and misrepresentations, we refer to section 148 of the Restatement:

> (2)  When the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made, the forum will consider such of the following contacts, among others, as may be present in the particular case in determining the state which, with respect to the

particular issue, has the most significant relationship to the occurrence and the parties:

(a)     the place, or places, where the plaintiff acted in reliance upon the defendant's representations,

(b)     the place where the plaintiff received the representations,

(c)     the place where the defendant made the representations,

(d)     the domicil, residence, nationality, place of incorporation and place of business of the parties,

(e)     the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and

(f)     the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

Restatement (Second) of Conflict of Laws § 148(2). The Restatement's enumerated contacts are not to be evaluated quantitatively, but according to their relative importance. *Id.*

Evaluating the parties' respective contacts in light of the Restatement's considerations, South Dakota was the place where: (1) appellants were domiciled, (2) appellants were located when they made the representations that are the basis for Ghosh's claims, and (3) the Jaguar was located at certain relevant times. Texas was the place where: (1) Ghosh was domiciled, (2) Ghosh was located when the representations were made, (3) the Jaguar was located at certain relevant times, (4) Ghosh relied on the representations, and (5) the sale transaction, as discussed above, was conducted or performed. Examining the first three factors listed for both South Dakota and Texas, the relationship of the parties' contacts to each state appears to be equal. However, it was in Texas that Ghosh relied on appellants' actions and where the sale was performed. According to the Restatement, the place where one party made and the other party received misrepresentations are of equal importance, but the place of reliance outweighs either factor in importance to the choice

44

of law inquiry. Restatement (Second) of Conflict of Laws § 148(2), cmt. g; *Tracker Marine, L.P. v. Ogle*, 108 S.W.3d 349, 356 (Tex. App.—Houston [14th Dist.] 2003, no pet.). Further, the Restatement places more weight on the plaintiff's domicile than the defendant's "because a financial loss will usually be of greatest concern to the state with which the person suffering the loss has the closest relationship." Restatement (Second) of Conflict of Laws § 148(2), cmt. i; *Tracker Marine, L.P.*, 108 S.W.3d at 356. Considering all the factors relevant to a claim for fraud or misrepresentation and weighing their relative importance, Texas appears to have a more significant relationship to the issues involved in this case.

Furthermore, reviewing the policy concerns enumerated in section 6 of the Restatement persuades us that Texas law should apply. No specific provision in the Texas DTPA provides that it is to apply to out-of-state acts affecting Texas consumers; however, the legislature has mandated that the DTPA be "liberally construed and applied to promote its underlying purposes, which are to protect consumers against false, misleading, and deceptive business practices, unconscionable actions, and breaches of warranty." Tex. Bus. & Com. Code Ann. § 17.44(a) (West 2002). The DTPA's definition of "trade" and "commerce" includes the sale of any good or service "wherever situated" if the trade or commerce "directly or indirectly affect[s] the people of this state." Tex. Bus. & Com. Code Ann. § 17.45(6) (West Supp. 2007); *Tracker Marine, L.P.*, 108 S.W.3d at 355. Recognizing the legislature's intention that the DTPA be liberally construed to protect Texas consumers, courts generally apply the Texas DTPA to suits involving damages to Texas consumers, regardless of where the defendant maintains his business. *See, e.g., Tracker Marine, L.P.*, 108 S.W.3d at 355 (applying Texas DTPA to suit against Missouri-based corporation);

45

*Busse v. Pacific Cattle Feeding Fund No. 1, Ltd.*, 896 S.W.2d 807, 814 (Tex. App.—Texarkana 1995, writ denied) (applying Texas DTPA to suit against Iowa resident).

We conclude that the trial court did not err in applying Texas rather than South Dakota law. We overrule appellants' twenty-sixth point of error.

**Jury charge**

In their twenty-third through twenty-fifth points of error, appellants complain that the trial court abused its discretion in refusing to submit various issues and instructions to the jury.

Rule 278 of the Texas Rules of Civil Procedure provides that a "court shall submit the questions, instructions and definitions in the form provided by Rule 277, which are raised by the written pleadings and evidence." Tex. R. Civ. P. 278. Under Rule 278, the trial court is required to submit questions to the jury if the pleadings and any evidence support them. *Elbaor v. Smith*, 845 S.W.2d 240, 243 (Tex. 1992); *Rosell v. Central W. Motor Stages, Inc.*, 89 S.W.3d 643, 653 (Tex. App.—Dallas 2002, pet. denied). To determine whether the trial court should have submitted appellants' issues to the jury, we must examine the record to determine if the pleadings and legally sufficient evidence support them. *Elbaor*, 845 S.W.2d at 243; *4901 Main, Inc. v. TAS Auto., Inc.*, 187 S.W.3d 627, 630-31 (Tex. App.—Houston [14th Dist.] 2006, no pet.). If, reviewing the evidence in favor of the party against whom the questions were refused, we find more than a scintilla of evidence supports submission of a valid theory of recovery, we will reverse. *Elbaor*, 845 S.W.2d at 243; *Rosell v. Central W. Motor Stages, Inc.*, 89 S.W.3d 643, 653 (Tex. App.—Dallas 2002, pet. denied).

46

A trial court is afforded more discretion when submitting instructions than when submitting questions. *TXI Transp. Co. v. Hughes*, 224 S.W.3d 870, 900 (Tex. App.—Fort Worth 2007, pet. filed); *Wal-Mart Stores, Inc. v. Middleton*, 982 S.W.2d 468, 470 (Tex. App.—San Antonio 1998, pet. denied). We review a trial court's decision to submit or refuse a particular instruction under an abuse of discretion standard of review. *In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000). The trial court has broad discretion to determine necessary and proper jury instructions. *Id.* A trial court abuses its discretion by acting arbitrarily, unreasonably, or without consideration of guiding principles. *Mercedes-Benz Credit Corp. v. Rhyne*, 925 S.W.2d 664, 666 (Tex. 1996); *Ganesan v. Vallabhaneni*, 96 S.W.3d 345, 350 (Tex. App.—Austin 2002, pet. denied).

To determine whether an alleged error in the jury charge is reversible, we consider the parties' pleadings, the evidence presented at trial, and the jury charge in its entirety. *Rosell*, 89 S.W.3d at 653. We will reverse where the trial court has denied a proper submission of a valid theory of recovery raised by the pleadings and evidence. *Id.* Otherwise, we will not reverse unless we find that an error in the jury charge caused an improper judgment to be rendered. Tex. R. App. P. 44.1(a)(1); *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006); *Wal-Mart Stores, Inc. v. Johnson*, 106 S.W.3d 718, 723 (Tex. 2003).

In point of error twenty-four, appellants argue that the trial court should have submitted a jury question inquiring where the sale contract for the Jaguar was executed. They urge this is a disputed material fact issue going to both personal jurisdiction and choice of law. For reasons we have already explained, the place of execution is immaterial to both issues, which, in

47

any event, are for the trial court rather than the jury. The trial court did not abuse its discretion in refusing it.

In point of error twenty-three, appellants argue that they were entitled to a jury question and accompanying instructions regarding whether the sale agreement regarding the red Jaguar was an "as is" contract, which they regard as an affirmative defense to Ghosh's claims. To support their assertion that an "as is" contract is a defense to suit under the DTPA, appellants rely on *Prudential v. Jefferson Associates*. 896 S.W.2d 156, 161-62 (Tex. 1995).

We need not address appellants' *Prudential* argument because their "as is" question was not properly submitted. *Rosell*, 89 S.W.3d at 653 (requiring reversal only where the trial court has denied a *proper* submission of a valid theory of recovery raised by the pleadings and evidence). Here, causation was already included in the first jury question submitted,[29] and an affirmative answer to a separate "as is" question, would have negated a finding of causation as a matter of law. *See Prudential*, 896 S.W.2d at 161-62 (holding that, as a matter of law, a valid "as is" provision negates causation). A question that "presents a contrary or inconsistent theory from the claim relied upon for recovery" is an inferential rebuttal. *Diamond Offshore Mgmt. Co. v. Guidry*, 171 S.W.3d 840,

---

[29] The first question of the jury charge reads:

Did any of the defendants listed below engage in any false, misleading, or deceptive act or practice that Avijit Ghosh relied on to his detriment and that was a producing cause of damages to Avijit Ghosh?

The following instruction was also included:

"Producing cause" means an efficient, exciting, or producing cause that, in a natural sequence, produced the damages, if any. There may be more than one producing cause.

48

844 (Tex. 2005) (citing *Select Ins. Co. v. Boucher*, 561 S.W.2d 474, 477 (Tex. 1978)).  Inferential

rebuttal questions or issues are properly submitted only in the form of instructions.  Tex. R. Civ. P.

277.  Because appellants submitted their "as is" question as an improper inferential rebuttal question

rather than as an appropriate instruction to the liability question submitted by the court without

objection, the trial court did not abuse its discretion in refusing the submission.[30]

        In point of error twenty-five, appellants urge they were entitled to a jury instruction

that "a seller has no duty to disclose facts he does not know and that a seller is not liable for failing

to disclose what he only should have known."  As appellees suggest, this requested instruction

regarding duty-to-disclose was subsumed in the trial court's broad-form DTPA "laundry list"

---

[30] We also note that the parties never executed a written contract.  Under the Uniform Commercial Code, contracts for the sale of goods worth over $500 must be in writing to be enforceable.  Tex. Bus. & Com. Code § 2.201(a).  We further note that, despite their use of "as is" language in their pleadings, appellants pleaded their issue not as a *Prudential* "as is" causation issue, *see Prudential*, 896 S.W.2d at 161-62, but as issues of waiver, assumption of risk, contributory negligence, and fraud:

> Defendants will further show that Defendant is not a dealer in or a merchant of automobiles and is not liable in any capacity as a dealer or merchant.

> Defendants will further show that the defenses of assumption of risk, contributory negligence, fraud, and waiver are applicable in this case by virtue of the fact that Plaintiff agreed to take the automobile "as is," thereby assuming the risk of any faults in the automobile, that failure to inspect was contributory negligence, that it is fraud for Plaintiff after having agreed to take the car "as is" to bring this action and make the allegations Plaintiff makes, and that Plaintiff intentionally waived his rights to inspect the car in order to get a better price.

Under *Prudential*, an enforceable "as is" clause negates the element of causation.  It is not a theory of waiver, assumption of risk, contributory negligence, or fraud.

49

submission.[31] The goal of the charge is to submit to the jury the issues for decision logically, simply, clearly, fairly, correctly, and completely. *Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 664 (Tex. 1998). Courts should only submit questions, definitions, and instructions when the submissions will help the jury to understand the meaning and effect of the law. *Houghton v. Port Terminal R.R. Ass'n*, 999 S.W.2d 39, 45 (Tex. App.—Houston [14th Dist.] 1999, no pet.). The trial court's charge need not and should not burden the jury with surplus instructions, even if the additional instructions are correct statements of the law. *See Acord v. General Motors Corp.*, 669 S.W.2d 111, 116 (Tex. 1984). Texas courts have treated surplus instructions to the charge as impermissible comments that tilt or nudge the jury one way or the other. *See Lemos v. Montez*, 680 S.W.2d 798, 801 (Tex. 1984); *Acord*, 669 S.W.2d at 116; *Gulf Coast State Bank v. Emenhiser*, 562 S.W.2d 449, 453 (Tex. 1978). We conclude that the trial court did not abuse its discretion in refusing this instruction.[32]

We overrule appellants' twenty-third through twenty-fifth points of error.

**Evidentiary-sufficiency challenges to jury findings**

In their fifth through twenty-second points of error, appellants challenge the legal and factual sufficiency of the evidence to support various jury findings. Appellants place greatest

---

[31] Specifically, the submission inquired, "Did any of the defendants listed below engage in any false, misleading, or deceptive act or practice that Avijit Ghosh relied on to his detriment and that was a producing cause of damage to Avijit Ghosh?" The jury, as noted previously, was instructed regarding four forms of false, misleading and deceptive acts or practices, including failure to disclose information "that was known at the time of the transaction."

[32] In fact, the trial court expressed its view during the charge conference that the proposed instruction "would be a form of nudging for the jury, since that matter is already contained in the definition of false, misleading or deceptive act or practice."

50

emphasis on points five and six, in which they attack the evidence supporting the jury's actual damages award. The remaining points concern the jury's liability findings. We have previously summarized the standards of review governing evidentiary-sufficiency challenges.

The measure of damages submitted to the jury was "the difference, on January 31, 2003, in Travis County, Texas, between the value of the Jaguar as it was delivered to Ghosh and the value it would have had had it been as represented." Based on this instruction, the jury found that the difference in the market value of the car as represented and as delivered was $11,500. According to appellants, there was no evidence of the market value of the Jaguar as it was delivered to Ghosh, and there was no evidence of the market value of car as represented by Herting.

Market value is the amount that would be paid in cash by a willing buyer who desires to buy, but who is not required to buy, to a willing seller who desires to sell, but who does not need to sell. *Taub v. City of Deer Park*, 882 S.W.2d 824, 827 (Tex. 1994); *Exxon Corp. v. Middleton*, 613 S.W.2d 240, 246 (Tex. 1981); *Humes v. Hallmark*, 895 S.W.2d 475, 480 (Tex. App.—Austin 1995, no writ). GJP's agreement to sell and Ghosh's agreement to buy the car as represented for $35,000 is evidence of what a willing buyer would pay a willing seller for the car. In other words, the parties' agreement to transfer ownership of the car for $35,000 is evidence that the car's market value was $35,000 as represented.

Appellants also argue that no evidence was presented as to the market value of the Jaguar as delivered. Although no witness directly stated the Jaguar's market value as delivered, several witnesses testified to, and several documents showed, the cost of repairs required to make the car driveable, or to restore the car to its condition as represented by Herting. Cost of repairs is

51

evidence of the difference in fair market value as delivered and as represented. *See Celanese Ltd. v. Chemical Waste Mgmt., Inc.*, 75 S.W.3d 593, 599 (Tex. App.—Texarkana 2002, pet. denied) (concluding that "the cost of repair . . . can provide the necessary evidence to support the jury's finding on change in market value."); *Central Freight Lines, Inc. v. Naztec, Inc.*, 790 S.W.2d 733, 734-35 (Tex. App.—El Paso 1990, no writ) (explaining that, despite testimony that damaged units had no value when delivered, where measure of damages was difference in market value and plaintiff elected to repair damages, evidence of the costs of repair became relevant and material and therefore admissible, not as proof of an alternative measure of damages, but as evidence bearing on the difference in market value"); *Dunlap v. Mars Plumbing Supply Co.*, 504 S.W.2d 917, 919 (Tex. App.—San Antonio 1973, no writ) (finding difference in market value before and after damage to be equal to cost of repairs).

Here, the parties offered conflicting evidence of costs of repair. According to Ghosh, Andy McCreadie, an employee of Classic Jaguar, determined that repairing the cracked and unsafe engine frames would require removing the engine and gearbox, at a cost of $8,000 to $10,000. Also according to Ghosh, McCreadie reported that the car was worth only $10,000 to $12,000 in its current condition. Dan Mooney, by contrast, opined that getting the car back on the road safely would cost about $5,000; however, this estimate did not include the cost of rebuilding the engine—which he estimated to be $6,500—and there was disputed evidence whether such a step might be warranted. Robert Tyrone, appellants' expert, testified that the cost of repairs to make the car roadworthy would be approximately $12,000.

52

This range of evidence of repair costs is legally and factually sufficient to support implied findings of the red Jaguar's fair market value as delivered that, in turn, would support the jury's calculation of benefit-of-the-bargain damages. *See City of Keller*, 168 S.W.3d at 829-30; *Cain*, 709 S.W.2d at 176.

In points of error seven through twenty-two, appellants argue that the evidence is legally and factually insufficient to support the jury's liability findings. Appellants contend only that the sole evidence of any misrepresentations made by Herting were mere puffery and cannot support liability.

Whether a statement is an assertion of material fact or merely one of opinion—or mere puffery—depends on the circumstances in which a statement is made. *Transport Ins. Co. v. Faircloth*, 898 S.W.2d 269, 276 (Tex. 1995). Relevant circumstances include "the statement's specificity, the speaker's knowledge, the comparative levels of the speaker's and the hearer's knowledge, and whether the statement relates to the present or the future." *Id.* Even an opinion may be actionable if: (1) it is "intertwined" with "direct representations of present facts;" (2) "the speaker has knowledge of its falsity;" (3) it is "based on past or present facts;" or (4) the speaker has "special knowledge of facts that will occur or exist in the future." *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930-31 (Tex. 1983). "When a speaker purports to have special knowledge of the facts, or does have superior knowledge of the facts—for example, when the facts underlying the opinion are not equally available to both parties—a party may maintain a fraud action." *Paull v. Capital Res. Mgmt., Inc.*, 987 S.W.2d 214, 219 (Tex. App.—Austin 1999, pet. denied).

Examples of representations that can amount to mere puffery or opinion include claims that an investment is "low risk" and will "produce large revenues for a long time," *see Paull*, 987 S.W.2d at 218-19, that a settlement is "top dollar," *see Faircloth*, 898 S.W.2d at 276, and that a property is "superb," "super fine," and "one of the finest little properties in the City of Austin." *Prudential*, 896 S.W.2d at 163. Likewise, using "broad, and vague, commendatory language comparing [one's] goods favorably with others, or praising them as good, proper, sufficient, and the like" amounts to mere sales talk, or puffery, not a statement of material fact. W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 109 (5th ed. 1984) (internal quotation marks and citations omitted).

Here, by contrast, Herting told Ghosh that he drove the Jaguar regularly, that it drove "very well," that he had "no problems whatever," that the car was "in fine running order," that "it's been very, very reliable," and that it had "strong mechanicals." After Ghosh purchased the car, an inspection revealed structurally unsafe engine frames, corrosion, and serious engine problems. In this context, Herting's statements were not mere sales hype; but were in the nature of factual representations. *See Trenholm*, 646 S.W.2d at 930-31. Further, as the owner and restorer of the car, Herting purported to have "special knowledge of the facts" and did "have superior knowledge of the facts," which were not "equally available to both parties." *See Paull*, 987 S.W.2d at 219. We overrule appellants' seventh through twenty-second points.

**Attorney's fees**

Finally, in their twenty-seventh point of error, appellants argue that the trial court erred in awarding attorney's fees because the judgment on which the award is predicated is

erroneous.  Having overruled each of appellants' points of error challenging the underlying judgment, we overrule this point as well.

## CONCLUSION

Having overruled each of appellants' points of error, we affirm the district court's judgment.

_____

Bob Pemberton, Justice

Before Justices Patterson, Pemberton and Henson

Affirmed

Filed:   March 28, 2008