

# NUMBER 13-19-00518-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

| | |
|---|---|
| **LORENZO REYES MARTINEZ,** | **Appellant,** |
| **v.** | |
| **HERBERT C. MARTINEZ AND REAL ESTATE EXECUTIVES OF AUSTIN, LLC; AND TEXAS AMERICAN TITLE COMPANY D/B/A INDEPENDENCE TITLE COMPANY,** | **Appellees.** |

### On appeal from the 345th District Court of Travis County, Texas.

## MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Benavides and Longoria
Memorandum Opinion by Chief Justice Contreras**

Appellant Lorenzo Reyes Martinez appeals from summary judgments granted in

favor of appellees Herbert C. Martinez; Real Estate Executives of Austin, LLC (REEA);

and Texas American Title Company d/b/a Independence Title Company

(Independence).[1] By one issue, Lorenzo argues the trial court erred when it granted summary judgment to appellees based on an exemption from the Deceptive Trade Practices Act (DTPA) for real estate professionals. *See* Tex. Bus. & Com. Code Ann. § 17.49(i)(1)–(3). We affirm in part and reverse and remand in part.[2]

## I.   BACKGROUND[3]

The dispute between the parties stems from the sale of a home in Austin, Texas, that Lorenzo and his ex-wife Ruth Salazar cohabitated in during their marital union. In 2017, Lorenzo and Ruth sold the home with the assistance of a realtor (Herbert) and his real estate agency (REEA), and Independence performed the title work for the sale. Both Lorenzo and Ruth are citizens of Mexico, and the record indicates that their communications with Herbert, REEA, and Independence were largely in Spanish.

The home was purchased in 2002 by Lorenzo's uncle, Luciano Reyes, with the assistance of Herbert and REEA. According to Lorenzo and Luciano, Lorenzo was involved in the process, and the intention was that (1) the home would be in Luciano's name but was actually Lorenzo's and (2) Luciano would secure credit for the purchase under his name and Lorenzo would make the mortgage payments.[4] At the time the home was purchased in 2002, Lorenzo was not married. In April 2005, Lorenzo married Ruth in Georgia, and they moved into the Austin house in 2008. In August 2010, after Lorenzo

---

[1] We will refer to individuals by their first name.

[2] This case is before this Court on transfer from the Third Court of Appeals in Austin pursuant to a docket-equalization order issued by the Supreme Court of Texas. *See* Tex. Gov't Code Ann. § 73.001. Because this is a transfer case, we apply the precedent of the Austin Court of Appeals to the extent it differs from our own. *See* Tex. R. App. P. 41.3.

[3] The background is taken from multiple depositions, affidavits, and documents in the summary judgment record, as well as allegations in the pleadings.

[4] In his deposition, Herbert testified that he did not recall Lorenzo's involvement in that transaction.

paid off the mortgage on the home in Luciano's name, Luciano transferred title to the house by quit claim deed to Ruth. In late 2016, Lorenzo and Ruth decided to sell the home.

Lorenzo and Ruth reached out to Herbert and REEA to list the house for sale. On November 29, 2016, the four parties executed a "Residential Real Estate Listing Agreement," which listed Lorenzo and Ruth as the sellers of the home and REEA and Herbert as their exclusive broker for the sale, among other specifics. Lorenzo, Ruth, Herbert, and REEA also executed together a "Seller's Disclosure of Information on Lead-Based Paint and Lead-Based Paint Hazards," and Lorenzo and Ruth filled out and signed a seller's disclosure notice that was provided to Herbert and REEA for them to provide to prospective buyers. *See* TEX. PROP. CODE ANN. § 5.008 (requiring a "seller" of single-unit dwelling residential real property to disclose certain conditions of the property to buyers).

Herbert and REEA placed the house on the market, and Lorenzo and Ruth received multiple offers while simultaneously looking for a new house with the assistance of Herbert and REEA. Sometime during this process, Herbert learned that ownership of the home the couple sought to sell was recorded solely in Ruth's name.[5]

While the house was on the market, Ruth filed for divorce; however, neither Ruth nor Lorenzo informed any of the appellees of the final divorce decree signed on December 20, 2016. The divorce decree awarded each Ruth and Lorenzo half of the proceeds from the sale of the house.

---

[5] In his deposition, Lorenzo states that the home was solely in Ruth's name because he "didn't think it was necessary" for his name to be on the deed and because he was working at the time Luciano transferred the property to Ruth. Lorenzo explained that Ruth was "the one who went together with . . . Luciano to sign the papers."

3

According to Lorenzo, Herbert and Ruth informed him that he did not need to be part of the sale or closing process for the house but did not elaborate why.[6] According to Herbert, Lorenzo did not need to be a part of the sale because the house was solely in Ruth's name and "one of the two" informed him that Ruth and Lorenzo were not married. Lorenzo and Ruth accepted two initial offers that did not materialize into a sale, and both sale contracts listed only Ruth as the seller.

Eventually, another offer was accepted and preparations for closing on the sale were made. Independence, the company tasked with providing the title work and closing on the sale, communicated an issue by email to the seller's email, Herbert, and Herbert's wife (Susie Martinez) ahead of closing: (1) the quit claim deed from Luciano to Ruth was unacceptable for title insurance and a general warranty deed needed to be executed; and (2) Luciano's wife did not sign the original quit claim deed and would need to sign the new general warranty deed. In the same email, Independence asked for the return of a "seller's information sheet," which asked for the marital status of Ruth, the only seller listed in the contract for sale for the accepted offer. The email included a copy of a general warranty deed and a seller's information disclosure sheet.

Herbert obtained Luciano's contact information from Lorenzo. Herbert then obtained the signatures of Luciano and his wife on the general warranty deed, which listed only Ruth as the grantee, and notarized it himself. Herbert returned the general warranty

---

[6] In his affidavit, Lorenzo states:

For most of the time while our Creekbranch home was on the market to be sold, the primary contact for Herbert C. Martinez and his real estate company was my wife, Ruth Salazar. I was working at my construction job, sometimes for long hours during the day, and my wife was more available at our home for the real estate issues. However, I had numerous communications with Herbert C. Martinez during this time. Our communications were either in person, by telephone, or by text message.

deed to Independence. The sellers information sheet, according to Herbert, was brought in by Ruth to his office; filled out by Herbert or his wife based on the information Ruth communicated to them at the time it was filled out, indicating that Ruth was not married and had never been married while she owned the home; and returned to Independence without Ruth's signature via email.

According to Lorenzo, on the day of closing, Herbert and Ruth told him that he did not need to go inside Independence's office with Ruth and to stay outside and wait in the car. According to Yvonne Barrera, Independence's representative, Ruth executed an affidavit at closing representing that she was not married and had not been married when she acquired the home and at all times thereafter. Barrera explained she was unaware Lorenzo existed and that Ruth had been previously married. According to Barrera, if Independence knew of the marriage, then it would have stopped the process and gone "through the process of clearing her husband's interest."

The sale was completed on April 3, 2017, and Independence deposited the proceeds into a bank account solely in Ruth's name, per her instructions at closing. Afterwards, according to Lorenzo, Ruth refused to give him his share of the proceeds and moved to Mexico.

Lorenzo brought suit against appellees and asserted multiple violations of the DTPA. Specifically, Lorenzo alleged Herbert and Martinez: (1) caused confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services, in violation of § 17.46(b)(2); (2) represented that services have approval, characteristics, uses, or benefits which they do not have or that they have a sponsorship, approval, status, affiliation, or connection which they do not have, in violation of § 17.46(b)(5); (3) represented that agreements conferred or involved rights, remedies, or

5

obligations which they did not have, in violation of § 17.46(b)(12); (4) misrepresented the authority of a salesman, representative, or agent to negotiate the final terms of a consumer transaction in violation of § 17.46(b)(14); (5) failed to disclose information which was known at the time of the transactions when such failure to disclose was intended to induce consumers into the transactions and to which consumers would not have entered had the information been disclosed, in violation of § 17.46(b)(24); and (6) engaged in unconscionable conduct in violation of § 17.50(a)(3). *See* TEX. BUS. & COM. CODE ANN. §§ 17.46(b), 17.50(a)(3).

Independence filed a no evidence motion for summary judgment on multiple grounds, including that Lorenzo was not a consumer and did not have standing and that there was no evidence of any failure to disclose, reliance, or unconscionable conduct by Independence.[7] Herbert and REEA filed a traditional motion for summary judgment and argued that, as a provider of real estate services, they were exempt from the DTPA.[8] Lorenzo filed responses to each motion; both sets of appellees filed replies and objections to Lorenzo's response and evidence attached in support.[9] Without holding a hearing, the

---

[7] In support of its no evidence motion, Independence attached a copy of the final decree of divorce; the quit claim deed; excerpts from the depositions of Lorenzo, Herbert, and Yvonne; affidavits by Yvonne and another of its employees, Brooke Heinson; the sale contract for the house listing only Ruth as the seller; the seller's information form; Ruth's affidavit of marital status; a settlement statement; and the seller's proceeds instructions.

[8] In support of their traditional motion, Herbert and REEA attached excerpts from depositions of Lorenzo, Herbert, and Yvonne, and copies of: Herbert's real estate broker license in Texas; REEA's real estate broker license; the general warranty deed executed by Luciano and his wife; the quit claim deed; Lorenzo's interrogatory responses; portions of the divorce decree; the email from Independence requesting the general warranty deed and seller's information sheet; the email from Herbert returning these items to Independence; the seller's information sheet; Ruth's affidavit of marital status; schedule C from Independence's title commitment; the listing agreement; the listing of the house with the Multiple Listing Service; and an affidavit by Herbert.

[9] In his response to Herbert's and REEA's motion, Lorenzo attached affidavits executed by him and Luciano and copies of: the listing agreement; the seller's disclosure notice; the seller's disclosure of information on lead-based paint; the sales agreement with only Ruth as the seller; a copy of a check from a joint checking account belonging to Lorenzo and Ruth that was provided to Herbert and REEA as part of

trial court granted both motions for summary judgment: it granted Herbert and REEA's traditional motion for summary judgment because the exemption they claimed from the DTPA applied and granted Independence's no evidence motion without specifying its reasoning. This appeal followed.

## II.  Discussion

By his sole issue, Lorenzo argues the trial court erred when it granted summary judgment because the exemption from the DTPA claimed by Herbert and REEA does not apply.[10]

### A.  Standard of Review

We review a trial court's decision on a motion for summary judgment de novo. *Katy Venture, Ltd. v. Cremona Bistro Corp.*, 469 S.W.3d 160, 163 (Tex. 2015) (per curiam). In a traditional motion for summary judgment, the movant has the burden of showing no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Katy Venture*, 469 S.W.3d at 163. Evidence raises a genuine issue of material fact if reasonable and fair-minded jurors could differ in their conclusions in light of all the evidence presented. *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007) (per curiam).

---

their attempts to purchase a new home; an email between Herbert and the other prospective buyers whose offers fell through; an email between Herbert and the seller of a home Lorenzo and Ruth attempted to purchase together; an email from Herbert to a third party stating that Lorenzo "owns the home I listed on the market for him free and clear" and "paid the home I sold to them, in a matter of 9 years," among other statements indicating Lorenzo was the owner of the home underlying this dispute; an agreement for the purchase of a new home signed by Lorenzo and Ruth; other documents executed by Lorenzo and Ruth together in their attempts to purchase a new home; and excerpts from the depositions of Lorenzo, Herbert, and Yvonne.

The trial court sustained objections from both sets of appellees to some of the evidence Lorenzo attached to each of his responses. He does not challenge those rulings on appeal.

[10] In his brief, Lorenzo states that he "is not pursuing an appeal from the rulings below as to" Independence.

Once the moving party produces evidence establishing its right to summary judgment as a matter of law, the burden shifts to the nonmovant to produce evidence that raises a genuine issue of material fact. *Walker v. Harris*, 924 S.W.2d 375, 376 (Tex. 1996). To determine if the nonmovant raised a fact issue, we review the evidence in the light most favorable to the nonmovant, crediting favorable evidence if reasonable jurors could do so, and disregarding contrary evidence unless reasonable jurors could not. *Hawthorne v. Guenther*, 461 S.W.3d 218, 221 (Tex. App.—San Antonio 2015, pet. denied). The function of a summary judgment is not to deprive a litigant of the right to a full hearing on the merits of any real issue, but to eliminate patently unmeritorious claims and untenable defenses. *Burchinal v. PJ Trailers-Seminole Mgmt. Co.*, 372 S.W.3d 200, 207 (Tex. App.—Texarkana 2012, no pet.); *see Gulbenkian v. Penn*, 252 S.W.2d 929, 931 (Tex. 1952).

## B.    DTPA

The DTPA provides protections for consumers from deceptive trade practices in the purchase and lease of goods and services. *See* TEX. BUS. & COM. CODE ANN. §§ 17.46, 17.50; *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649 (Tex. 1996); *Smith v. Baldwin*, 611 S.W.2d 611, 616 (Tex. 1980). "Services" means "work, labor, or service purchased or leased for use, including services furnished in connection with the sale or repair of goods." TEX. BUS. & COM. CODE ANN. § 17.45(2); *Smith*, 611 S.W.2d at 615–16.

We liberally construe and comprehensively apply the provisions of the DTPA to promote its underlying purpose, which is the protection of consumers. *Head v. U.S. Inspect DFW, Inc.*, 159 S.W.3d 731, 743 (Tex. App.—Fort Worth 2005, no pet.); *see* TEX. BUS. & COM. CODE ANN. § 17.44(a); *see also Marek v. Lehrer*, No. 03-17-00509-CV, 2018 WL 6217566, at *5 (Tex. App.—Austin Nov. 29, 2018, no pet.) (mem. op.). The elements

8

of a cause of action for violation of the DTPA are that (1) the plaintiff is a consumer, (2) the defendant can be sued under the DTPA, (3) the defendant committed a wrongful act under the statute, and (4) the defendant's actions were the producing cause of the plaintiff's damages. *See* TEX. BUS. & COM. CODE ANN. §§ 17.45, 17.46; *Amstadt*, 919 S.W.2d at 649.

A person may be exempted from the DTPA under § 17.49 of the business and commerce code. *See* TEX. BUS. & COM. CODE ANN. § 17.49. Relevant to this case, a licensed real estate broker or salesperson is exempted from the DTPA for "an act or omission by the persons while acting as a broker or salesperson." TEX. BUS. & COM. CODE ANN. § 17.49(i); *see Retherford v. Castro*, 378 S.W.3d 29, 35 (Tex. App.—Waco 2012, pet. denied); *see also* TEX. OCC. CODE ANN. ch. 1101 (titled "Real Estate Brokers and Sales Agents"). There are, however, some caveats. This exemption does not apply to:

> (1) an express misrepresentation of a material fact that cannot be characterized as advice, judgment, or opinion;
>
> (2) a failure to disclose information in violation of [§] 17.46(b)(24); or
>
> (3) an unconscionable action or course of action that cannot be characterized as advice, judgment, or opinion.

TEX. BUS. & COM. CODE ANN. § 17.49(i)(1)–(3); *see also id.* § 17.49(b)(24) (providing that "false, misleading, or deceptive acts or practices" includes failing to disclose information about the goods or services that was known at the time of the transaction with the intent to induce the consumer to enter into the transaction); *In re Rhee*, 481 B.R. 880, 892–93 (Bankr. S.D. Tex. 2012).

## C.    Analysis

We note that neither Herbert nor REEA argued at the trial court or on appeal that Lorenzo is not a consumer or that the DTPA does not apply; Herbert and REEA only

9

argued that they are exempted from the DTPA as real estate professionals, and the trial court granted summary judgment solely on that ground. It is also undisputed that Herbert and REEA are real estate brokers. Thus, we focus our analysis on the three possible caveats to the exemption from the DTPA for real estate brokers and sellers. *See* TEX. BUS. & COM. CODE ANN. § 17.49(i)(1)–(3); *see also Mays v. Pierce*, 203 S.W.3d 564, 571–72 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) (noting that violations of §§ 17.46 (deceptive practices) and 17.50(a)(3) (unconscionable conduct) are distinct "and either basis will support recovery").

### 1. Misrepresentation of a Material Fact

The first caveat to the DTPA exemption for real estate brokers and sellers provides that the DTPA applies to a broker's "express misrepresentation of a material fact that cannot be characterized as advice, judgment, or opinion." *See* TEX. BUS. & COM. CODE ANN. § 17.49(i)(1). Lorenzo pleaded four DTPA violations that could potentially fall under this caveat: §§ 17.46(b)(2), (5), (12), and (14). *See id.* §§ 17.46(b)(2), (5), (12), (14), 17.49(i)(1); *Douglas v. Delp*, 987 S.W.2d 879, 885-86 (Tex. 1999) (noting that § 17.46(b)(5) and (12) "are intended to protect consumers against misrepresentations of material fact"); *Pennington v. Singleton*, 606 S.W.2d 682, 687 (Tex. 1990) (noting that misrepresentations of material fact are actionable under § 17.46(b)(5) and (7) so long as they are not merely "puffing" or opinion); *Barclay v. Johnson*, 686 S.W.2d 334, 337 (Tex. App.—Houston [1st Dist.] 1985, no writ) ("Sections 17.46(b)(2), (3), (5), and (7) declare misrepresentations of fact to be unlawful.").

An actionable misrepresentation may be oral or written. *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 502 (Tex. 2011); *Barnett v. Coppell N. Tex. Court, Ltd.*, 123 S.W.3d 804, 822 (Tex. App.—Dallas 2003, pet. denied); *Wayne Duddlesten, Inc. v.*

10

*Highland Ins.*, 110 S.W.3d 85, 91 (Tex. App.—Houston [1st Dist.] 2003, pet. denied). A plaintiff need not prove the other party's intent to make a misrepresentation under § 17.46(b)(2), (5), (12), or (14); rather, the act of making the false representation is itself actionable. *See* TEX. BUS. & COM. CODE ANN. §§ 17.46(b)(2), (5), (12), (14), 17.49(i)(1); *Miller v. Keyser*, 90 S.W.3d 712, 716 (Tex. 2002); *Helena Chem. Co.*, 47 S.W.3d at 502; *Smith*, 611 S.W.2d at 616–17. And misrepresentations of fact made outside of a contract during the performance of services are also actionable under the DTPA. *See Best v. Ryan Auto Grp., Inc.*, 786 S.W.2d 670, 671 (Tex. 1990) (per curiam) (holding that evidence of representations outside the contract was legally sufficient evidence to support a claim under § 17.46(b)(12)); *Cont'l Dredging, Inc. v. De-Kaizered, Inc.*, 120 S.W.3d 380, 389–90 (Tex. App.—Texarkana 2003, pet. denied) (noting that misrepresentations outside of a contract between the parties may be a violation of the DTPA despite only economic loss); *Apple Imports*, 945 S.W.2d at 898–99; *see also Bossier Chrysler-Dodge II, Inc. v. Riley*, 221 S.W.3d 749, 756 (Tex. App.—Waco 2007, pet. denied); *Valley Nissan, Inc. v. Davila*, 133 S.W.3d 702, 710 (Tex. App.—Corpus Christi–Edinburg 2003, no pet.).

In his affidavit, Lorenzo states "Herbert C. Martinez represented to me that he would help me and protect my interest in the home." Lorenzo also complains that Herbert took actions that were inconsistent with his contractual promise that he would act as Lorenzo's realtor.[11] *See Van Duren v. Chife*, 569 S.W.3d 176, 190 (Tex. App.—Houston [1st Dist.] 2018, no pet.) ("Real estate brokers owe a fiduciary duty to their clients."); *Callaway v. Overholt*, 796 S.W.2d 828, 832 n.2 (Tex. App.—Austin 1990, writ denied)

---

[11] We note that the remedies for a breach of contract claim or a breach of fiduciary duty claim are cumulative to a DTPA claim and not mutually exclusive. *See* TEX. BUS. & COM. CODE ANN. § 17.43; *Smith v. Baldwin*, 611 S.W2d 611, 614 n.4 (Tex. 1980).

(noting that a "listing agreement" is an "express contract between seller and broker . . . in which the seller 'lists' his [or her] property with a broker" with some scope of authority "to negotiate a sale with potential buyers"); *see also* 22 TEX. ADMIN. CODE ANN. § 531.1–531.3; *Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 635 (Tex. 2007) (per curiam). However, a breach of a promise is not a misrepresentation of a material fact. *See* TEX. BUS. & COM. CODE ANN. § 17.49(i)(1); *see Head*, 159 S.W.3d at 742 (concluding that a broken "agreement to furnish a certain quality of services" was not a "misrepresentation" for purposes of DTPA exemption caveat); *see also Crawford v. Ace Sign, Inc.*, 917 S.W.2d 12, 13-14 (Tex. 1996) (per curiam) ("An allegation of a breach of contract, without more, does not constitute a 'false, misleading[,] or deceptive act in violation of the DTPA." (quoting *Ashford Dev., Inc. v. USLife Real Estate Servs.*, 661 S.W.2d 933, 935 (Tex. 1983))); *Conquest Drilling Fluids, Inc. v. Tri-Flo Int'l, Inc.*, 136 S.W.3d 299, 309 (Tex. App.—Beaumont 2004, no pet.) (op. on reh'g) (concluding that the alleged failure to fulfill a promise to build unit free of defects did not state violation of DTPA under § 17.46(b)(2), (5), and (7)); *Cont'l Dredging, Inc. v. De-Kaizered, Inc.*, 120 S.W.3d 380, 390 (Tex. App.—Texarkana 2003, pet. denied) (concluding all the representations occurred inside the bounds of the contract and gave rise to a breach of contract claim only and not a DTPA violation). Thus, to the extent Lorenzo complains of actions by Herbert and REEA inconsistent with their promises to "help me and protect my interest in the home" and to act as Lorenzo's realtor, we conclude that the first caveat does not apply. *See* TEX. BUS. & COM. CODE ANN. § 17.49(i)(1).

Lorenzo also argues that Herbert allegedly misrepresented the listing agreement when he wrote notes on the agreement, after it was signed, indicating that Lorenzo was a friend helping Ruth with the sale of the house. However, the trial court sustained the

12

objections by Herbert and REEA to the evidence Lorenzo submitted in support of this argument, and Lorenzo does not challenge those evidentiary rulings on appeal. As such, we reject this argument.

Finally, Lorenzo argues that Herbert and REEA made three other material misrepresentations: (1) the purpose of Herbert's communication with Luciano, (2) that Lorenzo did not need to be involved in the sale to protect his interest in the home, and (3) that Lorenzo "did not need to go into the actual closing" with Independence.

Whether a statement is an assertion of material fact or merely one of opinion depends on the circumstances in which the statement is made. *GJP, Inc. v. Ghosh*, 251 S.W.3d 854, 889 (Tex. App.—Austin 2008, no pet.); *cf. Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 338 (Tex. 2011) (fraud case); *Transp. Ins. Co. v. Faircloth*, 898 S.W.2d 269, 276 (Tex. 1995) (same); *see also Helm v. Kingston*, No. 13-10-00224-CV, 2011 WL 6746064, at *6 (Tex. App.—Corpus Christi–Edinburg Dec. 21, 2011, pet. denied) (mem. op.). Relevant circumstances include the statement's specificity, the speaker's knowledge, the comparative levels of the speaker's and the hearer's knowledge, and whether the statement relates to the present or the future. *GJP, Inc.*, 251 S.W.3d at 889; *Humble Nat'l Bank v. DCV, Inc.*, 933 S.W.2d 224, 230–31 (Tex. App.—Houston [14th Dist.] 1996, writ denied).

Regarding the reason Herbert needed to contact Luciano, Lorenzo states in his affidavit that "Herbert told me that he needed to talk to my uncle, Luciano Reyes, and asked me how to contact him. Herbert did not tell me why he needed to talk to my uncle." In his deposition, Lorenzo states that Herbert told him he needed to speak to Luciano "regarding the title or something like that." Thus, even according to Lorenzo, Herbert did

13

not make any misrepresentations of fact to him when he contacted him to obtain Luciano's contact information. Accordingly, the first caveat does not apply to this complaint.

Lorenzo states in his affidavit that: "At some point, for the sale of our Creekbranch home, I was told by Herbert and my wife that I did not need to sign any additional paperwork. I was told that Herbert could sell the property more quickly and easily as I was often not available and working." According to Lorenzo, this statement was Herbert's professional opinion and advice on how to sell the home quicker. It is possible that, because the title was solely in Ruth's name, Lorenzo would not be required to participate until the closing of the sale, and Herbert was never informed of the divorce. We conclude that, under these circumstances, the statement complained of can be categorized as Herbert's opinion. *See GJP, Inc.*, 251 S.W.3d at 889. Thus, the first caveat does not apply to this complaint. *See* TEX. BUS. & COM. CODE ANN. § 17.49(i)(1).

Regarding Herbert's statement that Lorenzo did not need to go inside Independence's office at closing, we note that there is evidence that Herbert knew Lorenzo had an interest in the home[12] and was married to Ruth.[13] This statement was

---

[12] In his affidavit, Lorenzo states:

> My uncle, Luciano Reyes, recommended Herbert C. Martinez to me as a realtor who he had done business with previously. My uncle and I met with Herbert to discuss how I could buy a house under my uncle's name. I was present when Luciano told Herbert that I was actually buying the house, not Luciano.

> Herbert represented that he was able to help in that real estate transaction. Herbert C. Martinez and his real estate company represented me in the purchase of the property . . ., although at my request it was in my uncle's name. I personally provided the purchase money for the transaction with Herbert's assistance. I did not sign any of the paperwork for the purchase of the home.

Lorenzo and Ruth together reached out to Herbert and REEA to sell this same home about fourteen years later.

[13] For example, Lorenzo states in his affidavit: "When he came to see the house during this period, if not before, Herbert C. Martinez met my wife Ruth." Luciano states in his affidavit that "For as long as they lived there, Lorenzo and Ruth lived together in the Creekbranch home as husband and wife. Throughout

14

made about a present event, as Herbert allegedly made this statement outside of Independence's office at the time of closing. Furthermore, as a realtor with over thirty years' experience, Herbert should have known that Lorenzo's interest in the real property could not be conveyed without his signature. *See* TEX. FAM. CODE ANN. §§ 3.002, 3.003; TEX. PROP. CODE ANN. § 5.021; *see also* 22 TEX. ADMIN. CODE ANN. § 531.3; *Dalton v. Don J. Jackson, Inc.*, 691 S.W.2d 765, 766–68 (Tex. App.—Austin 1985, no writ). This is true regardless of whether Herbert knew of the divorce. And, given that this was Lorenzo's first sale of a home and that he had an education of eleven years of primary school in Mexico, it is reasonable to infer he had no reason to know that he was required to be at closing. Herbert's statement was also specific and conveyed a definite implication. *See Pennington v. Singleton*, 606 S.W.2d 682, 687 (Tex. 1980); *GJP, Inc.*, 251 S.W.3d at 889. Thus, under these circumstances, we conclude that there are fact issues about whether Herbert's statement that Lorenzo need not go inside Independence's office or sign any of the closing documents was a misrepresentation of fact that cannot be categorized as judgment, opinion, or advice. *See GJP, Inc.*, 251 S.W.3d at 889 (noting that owner and seller of car "purported to have special knowledge of the facts' and did 'have superior knowledge of the facts', which were not equally available to both parties" and concluding statements complained of were factual representations); *Main Place Custom Homes, Inc. v. Honaker*, 192 S.W.3d 604, 624–25 (Tex. App.—Fort Worth 2006, pet. denied) (comparing knowledge of the home builder's representative and the home buyers and concluding that homebuilder's affirmative assertions regarding the property's conditions

---

that period, they held themselves out as husband and wife." There is also circumstantial evidence in that both Ruth and Lorenzo reached out together to Herbert to sell their home; they both executed the listing agreement, the seller's disclosure, and the lead paint disclosure; they submitted joint offers on new homes prior to the divorce through Herbert; and they provided an earnest-money payment to Herbert on one of the houses they attempted to purchase with both Lorenzo and Ruth listed on the account.

15

were not opinions but representations of fact); *Humble Nat'l Bank*, 933 S.W.2d at 230 ("An imprecise or vague representation constitutes a mere opinion."); *cf. Italian Cowboy*, 341 S.W.3d at 337–38 ("Special or one-sided knowledge may help lead to the conclusion that a statement is one of fact, not opinion."); *see also Padgett v. Bert Ogden Motors, Inc.*, 869 S.W.2d 532, 535–36 (Tex. App.—Corpus Christi–Edinburg 1993, writ denied) (concluding statements were actionable representations of fact where body shop employees had "specifically inspected and determined how to best repair [a purchaser's] car" and subsequently represented that the car was "completely repaired" and "completely fixed," even though they only partially repaired the car's frame); *Autohaus, Inc.*, 794 S.W.2d at 463 ("Superior knowledge of seller, in conjunction with the buyer's ignorance, operates to make the slightest divergence from mere praise into representations of fact as a warranty." (quoting *U.S. Pipe & Foundry v. City of Waco*, 108 S.W.2d 432, 436-37 (Tex. 1937))); *Kramer v. Hollmann*, No. 02-11-00136-CV, 2012 WL 5869423, at *3 (Tex. App.—Fort Worth Nov. 21, 2012, pet. denied) (mem. op.) ("Representations concerning past or present conditions require greater scrutiny that those concerning future conditions because predictions tend more toward opinion.").

This alleged misrepresentation was also material. *See Italian Cowboy*, 341 S.W.3d at 337 ("Material means a reasonable person would attach importance to and would be induced to act on the information in determining his choice of actions in the transaction in question."); *see also Morales v. Carlin*, No. 03-18-00376-CV, 2019 WL 1388524, at *3 (Tex. App.—Austin Mar. 28, 2019, no pet.) (mem. op.) ("A fact is material if it would likely affect the conduct of a reasonable person concerning the transaction in question."). We conclude that Lorenzo raised a fact issue as to whether the first caveat applies to Herbert's statement that Lorenzo did not need to go into Independence's office for the

16

closing of the sale.[14] *See* TEX. BUS. & COM. CODE ANN. § 17.49(i)(1); *GJP, Inc.*, 251 S.W.3d at 889.

Herbert and REEA argue that they were never aware that Lorenzo had an interest in the property; however, as noted above, there is evidence in the record that indicates otherwise. Herbert and REEA further argue that they made no misrepresentations to Lorenzo because they sold the home, which was the purpose of the listing agreement contract. We also reject this argument for the reasons stated above. Finally, Herbert and REEA argue they are not the producing cause of Lorenzo's loss, but they did not raise this argument in their motion for summary judgment. *See* TEX. R. CIV. P. 166a(c).[15]

## 2. Failure to Disclose

The second caveat to the DTPA exemption for real estate brokers and sellers provides that the DTPA applies to a broker when the broker fails "to disclose information concerning goods and services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed[.]" *See* TEX. BUS. & COM. CODE ANN. §§ 17.46(b)(24), 17.49(i)(2); *Patterson v. McMickle*, 191 S.W.3d 819, 827 (Tex. App.—Fort Worth 2006, no pet.). The term "transaction" contemplates an act or acts whereby an alteration of legal rights occur. *Head*, 159 S.W.3d at 744–45 (citing *Doe v. Boys Clubs of Greater Dall., Inc.*, 868 S.W.2d

---

[14] Whether this alleged misrepresentation violates all or some of the DTPA sections concerning a misrepresentation of fact pleaded by Lorenzo is not an issue before us, and we pass no opinion on this matter. *See* TEX. R. CIV. P. 166a(c) ("The motion for summary judgment shall state the specific grounds thereof.").

[15] Herbert and REEA argued that their actions were not the producing cause of Lorenzo's damages in their reply to Lorenzo's response to their traditional motion for summary judgment. However, "we may not affirm a summary judgment based on a ground the movants raised in their reply but not their motion." *Armour Pipe Line Co. v. Sandel Energy, Inc.*, 546 S.W.3d 455, 465 (Tex. App.—Houston [14th Dist.] 2018, pet. denied); *see* TEX. R. CIV. P. 166a(c).

942, 954 (Tex. App.—Amarillo 1994), *aff'd*, 907 S.W.2d 472 (Tex. 1995)); *see also Red Roof Inns, Inc v. Jolly*, No. 14-10-00344-CV, 2011 WL 6288147, at *7 (Tex. App.—Houston [14th Dist.] Dec. 15, 2011, no pet.).

Here, there were two "transactions": (1) when the parties executed the real estate listing agreement and (2) when the home was sold. *See Head*, 159 S.W.3d at 744. Lorenzo does not allege that Herbert and REEA intentionally withheld any information at the time or before the execution of the listing agreement; rather, he complains of failures to disclose events subsequent to that agreement. Specifically, Lorenzo argues that Herbert and REEA failed to disclose that "they discontinued representing [him] as a seller"; that they "only represented [Ruth] in the sale of the home"; that Ruth's "marital status or their marital history was a significant issue in the completed transaction for the sale of the home"; "the consequences of [Lorenzo's] marriage to [Ruth] at the time of the sale of the home"; that Lorenzo "needed to be involved in the closing to be entitled to his community property interest"; that there was an issue regarding Ruth's marital status; that Ruth alleged she was not married to Lorenzo; and that they represented both the buyers and the sellers in the sale of the house. However, none of these alleged failures to disclose induced Lorenzo to participate in the transaction at closing; instead, according to Lorenzo, he was induced into *not* participating in the transaction. *See Patterson*, 191 S.W.3d at 827 ("The plaintiff must also show that the information was withheld with the intent of inducing the consumer to engage in a transaction." (citing *Willowbrook Foods, Inc. v. Grinnell Corp.*, 147 S.W.3d 492, 507 (Tex. App.—San Antonio 2004, pet. denied))); *Head*, 159 S.W.3d at 744.

We conclude that Lorenzo failed to raise a fact issue that the second caveat to the DTPA exemption for real estate professionals applied to the alleged instances of failure

to disclose. *See* TEX. BUS. & COM. CODE ANN. §§ 17.46(b)(24), 17.49(i)(1); *Bradford v. Vento*, 48 S.W.3d 749, 760 (Tex. 2001); *Head*, 159 S.W.3d at 744–45; *Doe*, 868 S.W.2d at 954.

### 3. Unconscionable Action or Course of Action

The third caveat to the DTPA exemption for real estate brokers and sellers provides that the DTPA applies to a broker's "unconscionable action or course of action that cannot be characterized as advice, judgment, or opinion." *See* TEX. BUS. & COM. CODE ANN. § 17.49(i)(3). "Unconscionable action or course of action" is defined as "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." *Id.* § 17.45(5); *see Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 677 (Tex. 1998); *Latham v. Castillo*, 972 S.W.2d 66, 68 (Tex. 1998). "Grossly" means the resulting unfairness must be "glaringly noticeable, flagrant, complete and unmitigated." *Strobach v. WesTex Cmty. Credit Union*, No. 08-17-00182-CV, 2019 WL 3812366, at *16, __ S.W.3d __, __ (Tex. App.—El Paso Aug. 14, 2019, no pet.); *Yates Bros. Motor Co. v. Watson*, 548 S.W.3d 662, 671 (Tex. App.—Texarkana 2018, no pet.); *Bennett v. Bank United*, 114 S.W.3d 75, 82 (Tex. App.—Austin 2003, no pet.) (citing *Riverside Nat'l Bank v. Lewis*, 603 S.W.2d 169, 175 (Tex. 1980)). Unconscionability under the DTPA is an objective standard for which scienter is irrelevant. *Bradford*, 48 S.W.3d at 760; *Yates Bros. Motor Co. v. Watson*, 548 S.W.3d 662, 671 (Tex. App.—Texarkana 2018, no pet.).

Further, the unconscionable act or practice does not have to occur simultaneously with the purchase or lease of goods or services by the consumer. *Flenniken v. Longview Bank & Tr. Co*, 661 S.W.2d 705, 707 (Tex. 1983); *Teague v. Bandy*, 793 S.W.2d 50, 54 (Tex. App.—Austin 1990, writ denied). However, the unconscionable act or practice must

occur within the context of the purchase or lease of goods or services. *Flenniken*, 661 S.W.2d at 707; *see Hines v. Evergreen Cemetery Ass'n*, 865 S.W.2d 266, 269 (Tex. App.—Texarkana 1993, no writ).

In his affidavit, Lorenzo states:

> I am currently 37 years of age. I completed 11 years of high school [sic] in Mexico. Spanish is my preferred language. The Creekbranch property was the only home I ever purchased. Herbert C. Martinez and his real estate company are the only realtors and brokers with which I have ever done any real estate business.

> On April 1, 2005, Ruth Salazar and I were formally, officially married. My wife and I are the parents of 3 children. We lived together and held ourselves out publically [sic] as husband and wife from our marriage until we divorced on December 20, 2017.

> . . .

> This was the first time I had ever been involved in a real estate transaction of any kind. I have never previously purchased or sold a home.

> . . .

> When he came to see the house during this period, if not before, Herbert C. Martinez met my wife Ruth. I had a discussion with Herbert and told him that I needed to be involved in the sale of the home this time. On November 29, 2016, my wife and I initialed and signed an original Residential Real Estate Listing Agreement Exclusive Right to Sell our home . . . .

> From the moment I first contacted Herbert C. Martinez about assisting us with selling the home, Herbert C. Martinez never told me that he was not representing me in the sale of the home.

> Herbert C. Martinez never asked me whether Ruth or I had filed for divorce, were divorcing, or were planning to divorce. Herbert C. Martinez never asked me whether Ruth or I were married or not married. During the process of the sale of our home on Creekbranch, various offers were made, and several deals fell through. In early December, 2016, my wife and I received an offer to buy the Creekbranch home . . . . I was aware of the offer and of the contract. Herbert told me not to sign it. He only wanted Ruth to sign the contract for this offer. . . . Herbert never told me why he only wanted Ruth to sign that contract. I signed what Herbert told me to sign and did not sign what he did not want me to sign.

At some point, for the sale of our Creekbranch home, I was told by Herbert and my wife that I did not need to sign any additional paperwork. I was told that Herbert could sell the property more quickly and easily as I was often not available and working. Ruth was home with the children and more accessible than me.

Later, Herbert told me that he needed to talk to my uncle, Luciano Reyes, and asked me how he could contact him. Herbert did not tell me why he needed to talk to my uncle. I was not aware that Herbert notarized and had Luciano and his wife executed [sic] another deed for my home.

I drove my wife and our children to the closing of the sale of our home on April 3, 2017. My understanding was that I would go with Ruth to see Herbert for the closing and we both would sign documents. However, I was told by Herbert C. Martinez that I did not need to go into the actual closing, and I did not need to sign any of the closing documents or additional paperwork. I stayed outside with the children and waited for my wife to finalize the sale of our home.

Lorenzo's affidavit, the listing agreement, Luciano's affidavit, and the depositions of Herbert, Lorenzo, and Barrera raised fact issues as to whether Herbert and REEA took an unconscionable action or course of conduct in preventing Lorenzo from participating in the sale of the home, despite evidence supporting that Herbert and REEA were aware Lorenzo was married to Ruth and had an ownership interest in the home. *See Kennemore v. Bennett*, 755 S.W.2d 89, 91–92 (Tex. 1988); *Chastain*, 700 S.W.2d at 582–84; *Hawthorne*, 461 S.W.3d at 221.

There is evidence that Herbert was retained by Lorenzo to sell his interest in the home and that Lorenzo, who had no prior experience in the sale of real estate, was depending on Herbert to effect this. *See DeBakey v. Staggs*, 605 S.W.2d 631, 633 (Tex. App.—Houston [1st Dist.] 1980), *writ ref'd n.r.e.*, 612 S.W.2d 924 (Tex. 1981) (per curiam). Herbert's alleged misrepresentation to Lorenzo that he was not required to be at closing, coupled with a failure to notify him of his belief that Lorenzo had no interest in the home and was not their client, produced a glaringly noticeable, flagrant, complete and

21

unmitigated unfair result. *Cf. Latham*, 972 S.W.3d at 68–69 ("Attorneys can be found to have engaged in unconscionable conduct by the way they represent their clients."). This is because Herbert was paid by Lorenzo for services that did not benefit Lorenzo, and Lorenzo lost his share of the proceeds as a result of not being present at closing because it allowed Ruth to direct the funds to an account solely under her control.[16] There are fact issues regarding whether this result was achieved by Herbert taking advantage of Lorenzo's lack of knowledge and inexperience in real estate transactions to a grossly unfair degree. *See Bradford v. Vento*, 48 S.W.3d 749, 760 (Tex. 2001); *Hous. Livestock Rodeo*, 125 S.W.3d at 576; *DeBakey*, 605 S.W.2d at 633; *see also Latham*, 972 S.W.3d at 68–69 (concluding that attorney acted unconscionably when he affirmatively misrepresented to clients that he had filed claim when, in fact, he had not); *DeBakey*, 605 S.W.2d at 633 (finding that an attorney unconscionably took advantage of a client to a grossly unfair degree when the attorney failed to obtain in a timely manner a name change for the client's minor child). Therefore, looking at the evidence in the light most favorable to Lorenzo, we conclude that Lorenzo presented some evidence that he was taken advantage of to a grossly unfair degree. *See* TEX. BUS. & COM. CODE ANN. §§ 17.45(5), 17.49(i)(3), 17.50(a)(3); *Latham*, 92 S.W.3d at 69.

In response, Herbert and REEA make the same arguments we have previously rejected: they did not know Ruth and Lorenzo were married; Ruth told them she was not married to Lorenzo; the house was recorded solely in Ruth's name; and they were not the producing cause of Lorenzo's losses. We again reject these arguments.

---

[16] According to the record, Lorenzo's share of the proceeds totaled $70,091.79, and Herbert received a commission of $9,960.

We conclude that there is a fact issue as to whether the third caveat to the exemption from the DTPA for real estate professionals applied to Lorenzo's claims based on unconscionable conduct or course of conduct. *See* TEX. BUS. & COM. CODE ANN. § 17.49(i)(3).

### III. CONCLUSION

We reverse the trial court's judgment as it pertains to Lorenzo's claims for (1) misrepresentation of a material fact based on Herbert's statement that Lorenzo did not need to attend the closing of the sale and (2) unconscionable act or course of conduct. We remand for further proceedings consistent with this memorandum opinion. The remainder of the judgment is affirmed.

DORI CONTRERAS
Chief Justice

Delivered and filed the
1st day of October, 2020.

23